UNITED STATES of America,
Plaintiff-Appellee,

v.

Madeline MAXWELL and Walter Archibald Younge, Defendants-Appellants.

Nos. 76–2139, 76–2140.

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1978.

Decided Sept. 15, 1978.*

Rehearing Denied Nov. 24 and
Dec. 20, 1978.

* An opinion and unpublished order deciding this case were issued September 15, 1978. On November 24, 1978 the court withdrew the original opinion and issued in its place the instant opinion, left the unpublished order standing, and denied rehearing.

Alfred S. Vano, Chicago, Ill., ·Jack A. Strellis, Belleville, Ill., for defendants-appellants.

Robert Simpkins, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before PELL, TONE and BAUER, Circuit Judges.

TONE, Circuit Judge.

This opinion addresses three issues, (1) whether funds disbursed by a college under a student financial aid program were federal funds and thus covered by 18 U.S.C. § 641, (2) if so, whether transportation of fraudulent checks of the college drawn on the funds violated 18 U.S.C. § 2314 in view of the exception for federal securities contained in that section, and (3) whether the instructions given to the jury on the necessity of knowledge or foreseeability of interstate transportation under the latter statute constituted reversible error. We decide the other issues by an unpublished order and affirm the convictions.

Defendants were jointly tried before a jury and convicted under all counts of an 18-count indictment. Counts 1 through 9 charged that the defendants "did steal, purloin and convert to their own use, money" in various amounts "by making and negotiating false checks drawn upon checking accounts . . . at State Community College, East St. Louis, Illinois, of which 88.4% of said money . . . was the property of the Department of Health, Education and Welfare, . . . of the United States," in violation of 18 U.S.C. §§ 2 and 641. Counts 10 through 17 charged the defendants with transporting in interstate commerce falsely made and forged securities which were not the property of the United States, in violation of 18 U.S.C. §§ 2 and 2314. Count 18 of the indictment charged the defendants with conspiracy to defraud the United States by depriving it of its money and property by making false checks, in violation of 18 U.S.C. § 371.

During the period July 1974 through April 1975, defendant Madeline Maxwell was in charge of the accounting office of student financial aid at State Community College, a small junior college in East St. Louis, Illinois. The college had obtained federal funding for certain student financial aid programs from the Department of Health, Education and Welfare and, through Maxwell, administered four financial aid accounts: (1) National Defense Student Loan Fund; (2) College Work-Study Program; (3) Educational Opportunity Grant—Basic Grant; and (4) Educational Opportunity Grant—Supplemental Grant.

A separate bank account was maintained for each of these student aid accounts at the Union National Bank in East St. Louis. The money deposited in the accounts came from a "parent account" called the Illinois Junior College Board Account, which was maintained at the same bank by the Illinois College Board. Upon request by Maxwell, the Board would transfer funds from the parent account into the subaccounts.

When Maxwell determined that additional money was needed for the parent account, she would request that money and it would come in the form of a check payable to the college drawn on the United States Treasury. These checks were then deposited in the parent account.

Student aid checks were drawn payable to the students upon the various subaccounts. Ordinarily the checks were prepared by computer and then sent to the accounting office of financial aid, where they were checked for accuracy and signed. When the time report of a student on which a payment was based came in late or a student was left off the disbursement list for computer prepared checks for some other reason, the accounting office of financial aid would prepare the check on a typewriter and issue it to the student.

Maxwell, as head of the accounting office of financial aid, supervised that office and was responsible for the disbursement of funds and keeping the records thereof. These duties included making sure the checks were properly prepared and disbursed to students, preparation of typewritten checks, seeing that all checks were signed by a mechanical checkwriter, reconciling bank accounts, and posting to the books.

When HEW auditors audited State Community College's financial aid programs in April 1976, they discovered that checks which had been cashed were missing, that the missing checks were in much larger amounts than those that were normally issued to students, and that the purported payees were either fictitious persons or persons who did not attend the college. In addition, the auditors found that thousands of dollars had been transferred from the parent account into the subaccounts without any record being made of the transfers in the records maintained by Maxwell. In addition, the records maintained by Maxwell showed more money in the various accounts than the records maintained by the bank, in some instances the difference being between a negative balance and a positive balance.

The actual expenditures of funds for the programs during the period in question, including the checks to nonexistent students, greatly exceeded the amounts reported on the books as expenditures and the total available funds, which were $674,000. In attempting to reconcile the college records and the bank records, the auditors determined through examining microfilms that $167,390 had been paid to nonexistent students under the College Work-Study Program; $38,045 under the National Defense Student Loan Program; $46,255 under the Educational Opportunity Grant Program—Supplemental; and $17,205 under the Educational Opportunity Grant Program—Basic. These defalcations totaled $268,895.

Although the period covered was July 1, 1974 to June 30, 1975, the last check to a nonexistent student was issued on March 26, 1975. Maxwell left the college in April 1975.

The auditors found entries in the books which could reasonably have been found to be attempts to cover up the defalcations. All of these were made by Maxwell.

All of the irregular checks, 262 in number, were typewritten. The cancelled checks themselves were missing. When cancelled checks were returned by the bank to the college's financial accounting office, Maxwell had the first opportunity to handle them.

The 262 fraudulent checks were cashed at Lafayette Federal in St. Louis, Missouri. The first endorsement on the back of each check was purportedly made by the payee. The second endorsement on all checks was that of defendant Walter Archibald Younge, who would bring the checks to Lafayette Federal and purchase money orders with these and other checks he brought in to negotiate. Over the nine-month period charged in the indictment, Younge negotiated through Lafayette Federal approximately 900 checks, 262 of which were the fraudulent checks described above.

Younge would frequently stay at Maxwell's apartment. From time to time one of his employees would carry money and Lafayette Federal money orders from him

to Maxwell. Prior to the period covered by the indictment, money orders purchased at Lafayette Federal by Younge were used to pay Maxwell's apartment rent and to purchase an automobile for defendant Maxwell.

Younge owned a dinner theater called the Levee House, which included a bar called Laclede's Landing, in St. Louis and also owned the stock of a company that owned a combination restaurant and bar boat called the River Queen on the St. Louis · river front. The employees of these establishments were paid with Lafayette Federal money orders, which were in substantial part purchased with the proceeds of the fictitious checks issued from State Community College. Although Maxwell had no interest in the bar or Levee House, the liquor license for Laclede's Landing was in her name, and Younge issued Laclede's Landing checks signed "M. Maxwell." She would appear at Laclede's Landing two or three times a week for lunch and during the period in question called for Younge at the Levee House daily.

Neither the Levee House nor the River Queen were operated profitably during the period relevant here. Yet during that period Younge lived lavishly and made various large expenditures of money. His spending declined sharply in April 1975 and was halted completely by July 1 of that year. Younge gave conflicting statements as to the sources of the money he was spending.

## I.

### *Whether the Converted Funds Were the Property of the United States*

Defendants argue that the evidence offered in support of Counts 1 through 9 was insufficient to show that the converted funds fell within the statutory phrase, "money, or thing of value of the United States," 18 U.S.C. § 641.

The jurors were instructed that one of the elements they must find was that the funds stolen or purloined were property of the United States, but they were not given any guidelines for making this determination, neither side having tendered any. The defendants did contend in support of their

motions for directed verdict on Counts 1 through 9 that the evidence failed to show the funds were the property of the United States. The judge, in ruling on these motions, considered not only the stipulation of the parties referred to below, the federal checks deposited in the parent account, the contracts between HEW and the college, and other evidence, but also the HEW regulations governing the accounts, of which he was asked to take judicial notice. He stated that on the basis of all this he found the funds were federal funds. He did not, however, tell the jury he had determined as a matter of law that the funds were the property of the United States and in fact left it to them to decide whether that element of the crime had been proven. He also indicated to counsel a willingness to read the judicially noticed regulations to the jury, but counsel felt that was unnecessary. Under these circumstances, no objection could now be asserted as to the adequacy of the jury instructions on the federal funds issue, and defendants do not assert such an objection. Their trial counsel treated the federal fund issue as one of law before the District Court, and that is how they and Younge *pro se* argue it here. There is no dispute about the facts relevant to that issue. The dispute is whether, given those facts, the United States had a property interest in the funds. We hold that it did.

The parties stipulated that 88.4% of the money disbursed from the four relevant financial aid accounts

were funds which were disbursed from Washington, D.C., in the form of United States Treasury checks and deposited into the Illinois Junior College Board Account which was maintained at the Union National Bank, East St. Louis, Illinois. Said funds were then disbursed from the Illinois Junior College Board Account by way of checks drawn upon the Illinois Junior College Board and signed by authorized members of the Junior College Board into the [State Community College] Financial Aid Accounts heretofore referred to [which were the four accounts described above].

■ Eight of the nine counts charging offenses under § 641, Counts 2–9, relate to checks drawn on the account containing the Supplemental Educational Opportunity Grant funds. The statute pursuant to which HEW paid out funds that reached this account required that the agreement between that agency and the receiving institution include such "provisions as may be necessary to protect the financial interest of the United States . . .." 20 U.S.C. § 1070b–2(b)(6). In compliance with this direction the agreement between HEW and the junior college covering the Supplemental Educational Opportunity Grant program and the other three student aid programs imposed on the college restrictions relating to the handling of the money in the account and recordkeeping and reporting requirements. The HEW regulations governing the Supplemental Educational Opportunity Grant program provided that funds which had been initially allocated to an institution but which that institution did not anticipate using by the end of the period for which the funds were made available could be reallocated to other institutions. 45 C.F.R. § 176.4(b) (published June 19, 1973, 38 Fed. Reg. 15960).[1] The reallocation provision was not limited to funds that had not yet been paid by HEW to the institution.

The statute indicates that Congress intended that the United States retain "a financial interest" in the funds after they were paid to the institution, a financial interest HEW undertook to protect in the agreement with the institution and in the regulation by which it retained a reversionary interest in the funds. In our opinion, the institution held the funds as a trustee, the United States retained a beneficial interest in them, and this was sufficient to bring them within the phrase "money, or thing of value of the United States."

Although there are no cases directly in point, cases under the predecessor of § 641 have held that an interest as a bailee for hire, *Kambeitz v. United States,* 262 F. 378, 380 (2d Cir. 1919); *Fowler v. United States,* 273 F. 15, 17 (9th Cir. 1921), and control and the right to disburse, *Arbuckle v. United States,* 146 F.2d 657, 659 (D.C. Cir. 1944), are sufficient to satisfy the statutory words "of the United States." *United States v. Mason,* 218 U.S. 517, 531, 31 S.Ct. 28, 54 L.Ed. 1133 (1910), held that moneys received by a clerk of court as fees under the fee statute in effect at the time were "not received by the clerk as moneys or property belonging to the United States, but as the amount allowed to him for his compensation and office expenses . . ., and with respect to the amount payable when the return is made the clerk is not trustee but debtor." If the funds had been held by the clerk as trustee, the result presumably would have been different. Here, as we have held, there was a trust relationship under which the United States retained a beneficial interest.

■ Defendants cite several cases in support of their argument that the money stolen and converted from the accounts was not the property of the United States, as required by § 641. Three of these cases are easily distinguishable. *United States v. Owen,* 536 F.2d 340, 343 (10th Cir. 1976), expressly declines to decide the issue with which we are confronted here. *United States v. Morris,* 541 F.2d 153, 155 (6th Cir. 1976), held that a stolen check drawn by a private corporation which did not receive federal funds and payable to a county agency that did receive federal funds did not constitute property of the United States. The principal ground was that the county agency had never received the check and it was thus still the property of the private corporation when the defendant wrongfully deposited it in a personal account, although the court referred to commingling by the county agency and its failure to transfer the federal funds into the account or "isolate" them by separate accounts or bookkeeping. Here the federal funds were

---

1. References in the text are to the regulations as they existed at the time relevant to the counts in question. Later amendments to the regulations, published October 21, 1974, 39 Fed.Reg. 37987, refer to "a federal interest in allocated funds," and speak of the funds deposited by the institution in the bank pursuant to the program as "federal funds." *E. g.,* 45 C.F.R. §§ 176.23, 176.24, and 176.25.

traced into the accounts and the United States imposed recordkeeping and reporting requirements on the receiving institution. *United States v. Farrell,* 418 F.Supp. 308, 310 (M.D.Pa.1976), which involved a television set purchased by a local school district with federal funds, turned on the particular statute and regulation there applicable, but to the extent that the court believed title in the United States was necessary under § 641, we disagree.

The defendants also cite *United States v. Collins,* 464 F.2d 1163 (9th Cir. 1972), in which a divided court relied on a technical commercial law analysis in concluding that the stolen warrant, drawn by a city on an account containing federal funds, was not property of the United States. The court held that no federal property was involved because the warrant, meaning the piece of paper itself, belonged to the city that issued it, and the funds paid to the defendant belonged to the bank because a bank expends its own money rather than the money of its depositor when it pays a draft bearing a forged signature. We examined the *Collins* rationale and declined to apply it in a slightly different context, *United States v. Pavloski,* 574 F.2d 933, 935–936 (7th Cir. 1978), where we held that funds in an account are converted whenever the bank debits that account as a result of paying a fraudulent check. Applying *Pavloski,* rather than *Collins,* the relevant inquiry becomes whether the federal government maintains a property interest in the funds in that account. The *Collins* court does not address this issue. 464 F.2d at 1165.

In *United States v. Miller,* 520 F.2d 1208 (9th Cir. 1975), also relied on by defendants, the court gave two reasons for holding that property of the United States was converted when an erroneously issued federal check was cashed by the defendant: First, the check itself constituted a "thing of value" under § 641. Second, "since the check was erroneously issued, the right to the funds represented by the check did not pass from the federal government to the Council," and the government "was entitled to

have the money returned" and thus "suffered an actual property loss" by reason of the theft. 520 F.2d at 1210. The government has an analogous right in the case at bar with respect to the funds in the Supplemental Educational Opportunity Grant account, *viz.,* a reversionary interest evidenced by the power to reallocate money already allocated to an institution if the institution does not anticipate using that money before the end of the period for which it is available. Thus, *Miller* undermines rather than supports defendants' position.

■ The remaining § 641 count, Count 1, charges theft and conversion of money from all four student aid accounts. We need not decide, however, whether the funds in all the accounts were property of the United States, because some of the fraudulently drawn and cashed checks proved under this count were drawn on the Supplemental Educational Opportunity Grant account, which, as we have held, contained moneys of the United States. As the Supreme Court said in *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 24 L. Ed.2d 610 (1970),

> The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.

(Footnote omitted.) See *United States v. Outpost Development Co.,* 552 F.2d 868 (9th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 503, 54 L.Ed.2d 450 (1977). *Cf. Ingram v. United States,* 357 F.2d 339, 340 (5th Cir. 1966). This general rule applies here, because there is no conceivable basis in the record for an argument that the jury may have based its verdict on Count 1, not in part upon checks drawn on the Supplemental Educational Grant account, but solely upon other checks. The evidence concerning the checks drawn on that account was therefore sufficient to sustain the conviction under Count 1.[2]

---

**2.** Although it is unnecessary to go further, a federal property interest in at least two of the

other three accounts appears from the applicable provisions of the statute or regulations in

■ Because the funds in question constituted money or things of value of the United States, they were converted whenever the bank debited the account as a result of honoring a fraudulent check. *Cf. United States v. Pavloski, supra,* 574 F.2d 933; see also *United States v. Daley,* 454 F.2d 505, 509–510 (1st Cir. 1972). Defendants' challenge to the sufficiency of the record with respect to Counts 1 through 9 is therefore without merit.

## II.

### *Whether the Checks Were Federal Securities*

■ Defendants also argue that if the funds found to have been stolen under Counts 1 through 9 were federal funds, then the convictions under Counts 10 through 17 cannot stand, because 18 U.S.C. § 2314, on which those counts are based, does not apply when the transported securities are federal securities. The federal property interest in the funds does not, however, render the checks federal securities. The checks themselves, the pieces of paper, being the property of the college and not federal securities, were subject to § 2314. *Cf. United States v. Pavloski, supra,* 574 F.2d at 935.

For the same reason, Younge's other arguments based on the assumption that conviction on Counts 1 through 9 was inconsistent with convictions on Counts 10 through 17 are without merit.

## III.

### *Instruction on Knowledge or Foreseeability of Interstate Transportation*

■ The jury was instructed with respect to Counts 10 through 17 that the act of transporting in interstate commerce was an element of the crime and that it was also necessary that the defendants have done that act knowingly and wilfully. Those terms were defined in the usual way to mean intentionally and with the bad purpose of disobeying or disregarding the law. The court also gave the following instruction:

> The evidence in this case need not establish that the accused actually knew the securities mentioned in the indictment would be transported in interstate commerce.

Maxwell objects to this instruction on the ground that it "leaves the jury with impression that any cognizance of the interstate nexus is non-essential." Similarly, Younge argues, for the first time in his *pro se* reply brief, that the instructions on these counts were inadequate because "[i]t is necessary that a defendant reasonably foresee the interstate transportation of a forged document," although at trial his counsel did not object to the instructions on the ground that the jury should be instructed as to the necessity of finding foreseeability. We give Younge the benefit of Maxwell's objection at trial, and in view of his *pro se* status at the time of filing the reply brief, consider his argument on its merits.

The quoted instruction, as far as it goes, is a correct statement of the law. *United States v. Mingoia,* 424 F.2d 710, 712 (2d Cir. 1970). It implies that foreseeability is enough, as it is. *See United States v. Johnson,* 504 F.2d 622, 626 n. 10 (7th Cir. 1974); *United States v. Knippenberg,* 502 F.2d 1056, 1060 (7th Cir. 1974); but this should have been explicitly stated and not left to implication.

The omission was not reversible error, however, in the circumstances of this case. Regardless of how it was instructed with respect to knowledge of interstate transportation, the jury, by its guilty verdicts on the 17 counts of the indictment, necessarily found that the defendants knowingly and wilfully caused the fraudulent checks to be

---

effect at the relevant time. With respect to the National Defense Student Loan fund, the college is required ultimately to repay to the United States the federal capital contributions made to that fund. 20 U.S.C. § 1087ff. Pertinent regulations governing this program appeared as 45 C.F.R. §§ 144.11, 144.12. See also

45 C.F.R. §§ 144.18–144.20. Regulations governing the College Work-Study Program contain a provision requiring "[i]nterest, if any, earned on Federal funds" to be remitted to the United States. 45 C.F.R. § 175.7(b) (published May 13, 1969, 34 Fed.Reg. 7632).

drawn on an Illinois bank and negotiated at a Missouri savings and loan institution. The only checks involved were checks that were thus drawn and negotiated. Inevitably, then, it was foreseeable that the checks would be transported interstate to clear through the drawee bank. The jury accordingly necessarily concluded, whether or not it focused specifically on the necessity of finding foreseeability and whatever the deficiency in the instructions on this point, that interstate transportation of the checks was reasonably foreseeable.

For the reasons stated in this opinion and an accompanying unpublished order ruling on issues not meeting our standards for publication, the judgments of conviction are affirmed.

AFFIRMED.