**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ronald MITCHELL,**
**Defendant-Appellant.**

No. 79–2112.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1980.

Decided July 7, 1980.

Steven E. Katzman, Belleville, Ill., for defendant-appellant.

Mary B. Beauparlant, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before PELL, BAUER and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

Appellant was convicted by a jury of violating 18 U.S.C. § 641[1] by unlawfully attempting to convert a stolen Illinois Public Aid Warrant in the amount of $586.76. Approximately 50% of the money in the account on which the warrant was drawn was granted to the state by the federal government under 42 U.S.C. § 603 (Aid to Needy Families). Appellant complains, however, that the warrant was not "money, or a thing of value of the United States" within the meaning of § 641.

The facts underlying appellant's conviction are not in dispute. The warrant was mailed by the Illinois Warrant Distribution Center on September 5, 1978, and was payable to Earline Cook as her Aid to Families with Dependent Children (ADC) monthly allotment. Cook was away from her home when the warrant arrived, and it was taken from her mailbox without her knowledge or permission by Edna Handy, Cook's cousin, who was living at the same address. Handy informed appellant of the warrant's arrival. Both later traveled with a third individual to St. Louis, Missouri, to attempt to cash the warrant at a currency exchange. They were unsuccessful, however, due to their lack of sufficient identification, and were detained at the currency exchange while postal inspectors were summoned. They later voluntarily gave a statement to inspectors essentially relating the above information.

The Illinois ADC program is part of the federal effort, codified in Title 42 of the Social Security Act. The federal participation is initiated by the state's submission of a "state plan" which relates, among other things, an estimation of the state requirements for federal ADC funds and assurances that the state program will comply with all applicable federal regulations. The federal government reviews the plan and federal payments are made only after the plan is found to be compatible with federal guidelines. In Illinois, the federal payments amount to 50% of the total payments made to individuals under the state program.

Each fiscal quarter after the initiation of the program, the state submits various re-

---

1. 18 U.S.C. § 641 provides in relevant part:

        *   *   *   *   *   *

Whoever receives, conceals, or retains [any record, voucher, money, or thing of value of the United States] with intent to convert it to his own use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both

   ·   ·  ··

ports to the federal government which include details of past payments with documentary support and estimations of future needs. These reports must be reviewed and approved by the federal government before further funds are provided to the state. Upon the state's receipt of the federal money, it is placed in the Federal Public Trust Fund and is later transferred with the state money to the Illinois General Revenue Account from which the warrants to the individual recipients are drawn. The state is required to carry out a continuing quality control program and the federal government maintains a continuous observation of the state system including quarterly reviews and annual audits by the General Accounting Office and HEW and the state reports mentioned previously. Should discrepancies in these reports or misuse of funds be discovered, the federal government has the ultimate sanction of demanding the return of the allotted money. This sanction is usually accomplished by allowing the state to repay the money in installments through appropriate reductions in future federal grants to the state. *See* 45 C.F.R. §§ 200, 201.66(b)(4).

## I

As previously stated, appellant's primary contention is that the Illinois ADC warrant he attempted to cash was not "money or a thing of value of the United States." There are a number of recent federal cases addressing this question in similar circumstances. In *United States v. Collins*, 464 F.2d 1163 (9th Cir. 1972),[2] for example, which appellant principally relies upon, the court held that the defendant's forging and cashing a check drawn upon a bank account containing federal funds was not within § 641 because the paying bank, not the federal government, would ultimately be responsible for the money wrongfully paid to the defendant. *See* UCC § 4–401.

*United States v. Evans*, 572 F.2d 455 (5th Cir. 1978), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182, further defined the relevant inquiry by stating that the key factor when deciding whether § 641 covered funds embezzled from accounts partially containing federal money is the supervision and control over the federal funds contemplated and manifested by the federal government. *Id.* at 472. In *Evans*, the court held that the federal government's power to determine state allocations, to reallocate and generally control the use of the funds, as well as to be refunded an appropriate share of any surplus funds was sufficient to render the embezzled funds "federal" under § 641. *Id.*

This court also has had opportunity to define the appropriate considerations regarding this issue. In *United States v. Pavloski*, 574 F.2d 933 (7th Cir. 1978), the defendant was charged with violating 29 U.S.C. § 501 by forging and cashing checks drawn upon a labor union's bank account. The court held, similarly to *United States v. Miller*, 520 F.2d 1208 (9th Cir. 1975), that because the checks themselves were property of the union, § 501 applied regardless of the union's interest in the funds underlying the checks. However, this court went on to hold, contrary to *Collins, supra*, and relevant to § 641 prosecutions, that the union did in fact have an interest in the funds in spite of the fact that due to the forgery, the bank and not the union would ultimately be responsible for the money paid the defendant. This court noted that the funds were converted at the time the union's account was debited, though wrongfully, and held that the fact that those reductions were temporary (pending repayment by the bank) did not exonerate the defendant of liability.

In *United States v. Maxwell*, 588 F.2d 568 (7th Cir. 1978), *cert. denied*, 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979), this court applied *Pavloski* in a § 641 prosecu-

2. Appellant also relies upon *United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910), for the proposition that the ADC warrant to Cook was compensation, not federally granted funds subject to federal control, and

thus not within the purview of § 641. A review of *Mason*, which involved funds paid to a clerk of a court as compensation as opposed to fees due and owing the court itself, clearly reveals the case is inapposite.

tion, expressly declining to follow *Collins,* and held that the proper inquiry was whether the government retained a sufficient "property interest" in the funds embezzled from the state government's account partially containing federal money. 588 F.2d at 573. This court held there that the federal government's imposing requirements of record keeping, handling and reporting and retaining the power to reallocate unused funds manifested an intent to protect a sufficient "financial interest" of the United States and reasoned that the state institution held the funds as trustee with the United States retaining a beneficial interest in them. *Id.* at 572. The court expressly stated that the conversion was completed "whenever the bank debited the account as a result of honoring a fraudulent check." *Id.* at 574.

One of the most recent cases to consider this issue is *United States v. Smith,* 596 F.2d 662 (5th Cir. 1979). In that case the court followed the reasoning of *Evans* and *United States v. Rowen,* 594 F.2d 98 (5th Cir. 1979), *cert. denied,* 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44, and found the relevant inquiry to be whether the federal government exercised sufficient supervision and control over funds in a student work-study program partially sponsored by the federal government. The court held that the federal government's control over student participation in the program, the students' payment and hours, the form of applications, and the government's right to reimbursement for surplus funds was sufficient control to posit a violation of § 641 when the funds were embezzled.

■ A review of the pertinent statute, 42 U.S.C. § 603, and regulations, 45 C.F.R. § 200 *et seq.,* in the present case similarly reveals substantial and sufficient federal supervision and control over the funds granted by the federal government to the state ADC program. As previously stated, this supervision includes quarterly federal reviews and annual audits and state reports with the ultimate sanction for discrepancies in the reports or misuse of the funds being reclamation of the money by the federal government. The fact that this reclamation is normally or even always enforced on an installment basis by reductions in future allotments does not, we believe, remove the funds allotted from the protection provided by § 641. The installment method seems simply the most convenient means to accomplish the reclamation and we find, similarly to the Court's statement in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544, 63 S.Ct. 379, 384, 87 L.Ed. 443 (1943), that the statute "does not make the extent of [the fund's] safeguard depend upon the bookkeeping devices used for [its] distribution."

Nor do we believe that the fact that the bank and not the federal government would ultimately be responsible for the funds paid, had the appellant been successful in cashing the warrant, is sufficient to remove this warrant from federal protection. This technical analysis utilized in *Collins, supra,* has been rejected in most federal cases, *see Rowen, supra, Maxwell, supra, Pavloski, supra, United States v. Daley,* 454 F.2d 505 (1st Cir. 1972) and *United States v. Edwards,* 473 F.Supp. 81 (D.Mass.1979), and a strict application of the reasoning would lead to the anomalous conclusion that a violation of § 641 occurs only if it is not discovered because once it is discovered, the payor bank and not the owner of the funds is liable for the loss. In short, as in *Evans, supra,* the record in the present case clearly indicates that 50% of the money represented by the warrant had a federal origin, the relevant statute and regulations contemplate that ultimate repayment will be made to the federal government, and while the money is in the state government's hands it remains subject to substantial federal supervision and control. These circumstances lead to the conclusion that the warrant retained by the appellant with the intent to convert it to his own use was a "thing of value of the United States."

## II

■ Appellant next objects, relying once again upon *Collins, supra,* that the trial court erred in not instructing the jury that

the federal government must suffer some actual property loss for the defendant to be found guilty of violating § 641. Whether or not we would agree with *Collins* that a loss to the government is a requirement under § 641 when a defendant is charged, as was the case in *Collins*, with *converting* federal property to his own use, it is clear that holding has no relevance to this issue. Here, the appellant was charged only with the retention of federal property *with the intent to* convert it to his own use. We believe that in these circumstances the district judge properly instructed the jury on the necessary elements for conviction by reading the relevant portion of § 641 as set forth previously in the margin. Furthermore, even were an actual property loss to the government a requirement in this case, we believe a sufficient loss was suffered from the appellant's temporary retention and exercise of control over the warrant representing federal government money. The fact that the appellant was unsuccessful in actually cashing the warrant does not, of course, immunize him from liability under this paragraph of § 641. *Pavloski, supra; United States v. Lee*, 454 F.2d 190 (9th Cir. 1972); *Edwards, supra.*

### III

Appellant lastly complains[3] that the trial court's sentence of appellant to ten years in prison was excessive. It is well established, of course, that this court will not infringe upon the trial court's discretion in sentencing absent a clear showing of gross abuse of that discretion. *United States v. Willard*, 445 F.2d 814 (7th Cir. 1971); *United States v. Melendez*, 355 F.2d 914 (7th Cir. 1966). A sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review. *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Wilkinson*, 513 F.2d 227 (7th Cir. 1975).

In the present case, the ten year sentence, although the maximum, is within the limits of § 641. This is the third time the defendant has been convicted of similar crimes and the trial court properly reviewed and rejected the appellant's potential consideration under the Youthful Offenders Act. In these circumstances, we refuse to disturb the trial court's discretion. The judgment of the district court therefore is affirmed.

AFFIRMED.

3. The appellant's remaining contentions regarding prejudice of the jury, conspiracy of the government, and similar arguments are entirely unsupported in the record and therefore are specifically rejected as unpersuasive.