**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Thomas GANNON, Defendant-Appellant.**

**No. 80–1108.**

United States Court of Appeals, Seventh Circuit.

Argued En Banc Feb. 19, 1981.

Decided June 30, 1981.

Jerome Rotenberg, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., William R. Coulson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER, BAUER, WOOD and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

Appellant Thomas Gannon was convicted of 29 counts of violating The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601, 2607(b) (1976) (RESPA), by accepting payments for Torrens filings which were in excess of those authorized by state law. Each extra payment was the basis of a separate count of the indictment. Appellant, a counterman in the Torrens section of the Cook County, Illinois Recorder of Deeds office, acknowledged that he received and accepted the excess payments from local bank representatives whose filings he had handled. He claims, however, that RESPA does not apply to these payments because they were "gratuities," not "portions of the charges" made for settlement services "other than for services actu-

ally performed." 12 U.S.C. § 2607(b). A panel of this Court initially agreed with appellant's interpretation and reversed his conviction. *United States v. Gannon*, No. 80–1108 (7th Cir., Nov. 3, 1980). This opinion follows an *en banc* rehearing.

I

The undisputed evidence presented at appellant's trial reveals the following. The purpose of the Torrens section is to guarantee the title of Cook County real estate registered with it by issuing title certificates for the property. The counterman deals directly with the public by accepting land registration and transfer documents, examining the documents for correctness, transmitting the documents to other employees so that a new title certificate can be prepared if necessary, and charging and accepting the appropriate fees for these services. The fees are set by state statute and the countermen receive a salary in return for which they are to provide the public with prompt and courteous service.

Since the fall of 1977, a sign has been displayed in the Torrens section which states:

ATTENTION

OFFICE REGULATIONS PROHIBIT MEMBERS OF THE STAFF FROM ACCEPTING GRATUITIES FROM ANY SOURCE IN THE CONDUCT OF OFFICIAL BUSINESS.

In addition, in the fall of 1977, appellant signed a typed statement which provides:

The undersigned hereby acknowledges and understands that the acceptance of gratuities from any source in the conduct of office business is strictly forbidden. Violators of this regulation will be subject to disciplinary action.

A number of the section's customers are employees of various local banks or savings and loan institutions. The institutions are federally insured and use the Torrens services in the course of providing real estate loans. The bank employees can either

phone ahead to the Torrens office for an appointment with a specific counterman, or can arrive at the office without an appointment and wait in a line for service. They can pay for the Torrens service either in cash or by check which is given to the counterman in return for a stamped receipt.

A number of bank employees testified at appellant's trial that when they submitted the relevant documents and fees to appellant for Torrens registration or transfer, they gave two or three dollars to appellant in addition to the statutory amount. It is uncontested that appellant accepted these extra payments. The employees testified that they were told by their superiors, usually during training, that they should regularly make these additional payments to the countermen. Although there was no testimony that appellant requested or solicited these extra payments, one of the bank employees, Cheryl Olk, testified that after she ceased making the payments for her bank, appellant told her that she worked for a "cheap bank" and that if "something were not done," the bank's "work would not get done."[1] All of the bank employees testified that in return for the additional payments, they believed that they received "prompt" and good service from appellant.

## II

The basis of this appeal is that these extra payments were unsolicited "gratuities," which, although they may have violated state statutes or office regulations, did not violate RESPA because they were not the evil § 2607(b) was intended to address.

Section 2607 provides in pertinent part:
§ 2607. PROHIBITION AGAINST KICKBACKS AND UNEARNED FEES
—BUSINESS REFERRAL

(a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

—SPLITTING CHARGES

(b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

—FEES, SALARIES, COMPENSATION, OR OTHER PAYMENTS

(c) Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed. . . .

Appellant makes two arguments in support of his contention that § 2607(b) was not intended to apply to his actions. First, he claims that the gratuities were not a "portion" of the "charge made . . . for the rendering of real estate settlement services." Second, he contends that he performed real estate settlement services in return for the gratuities.

Regarding appellant's first argument, we must initially recognize the findings made by the district court that the "gratuities were a regular portion of the payments for the rendering of settlement services," and that the "[a]gents of the banks were given the impression that gratuities had to be paid in order to get the work done." Appellant claims that these comments were not formal factual findings requiring the application of the "clearly erroneous" standard. We disagree with appellant's characterization, however, irrespective of the standard applied, it appears the "comments" were adequately supported in the record.

■ To come within the scope of § 2607's prohibitions, a charge need not be imposed pursuant to a state statute or local regulation, or even be the result of a specific demand by the counterman. HUD regu-

---

1. Initially upon being informed that Olk's bank would cease making the payments, appellant said, "Fine. No problem," and for a period of time Olk's filings were handled "normally."

lations provide that an "agreement or understanding" for the referral of business that is illegal under § 2607(a)

> need not be verbalized but may be established by practice, pattern, or course of conduct pursuant to which the payor and the recipient of the thing of value understand that the payment is in return for the referral of business.

24 C.F.R. § 3500.14(c) (1980). We think a similar definition should be imposed upon the term "charge" in subsection (b). *See Weiner v. Swales*, 217 Md. 123, 141 A.2d 749, 750 (1958) ("charges" are "the expenses which have been incurred, or disbursements made, in connection with a contract, suit, or business transaction"). In this case, it is clear that the two- or three-dollar gratuities were as much a part of the "charge" imposed upon the customers as was the statutorily imposed segment. It is a reasonable inference from the evidence that in general, the continued "prompt" service was preconditioned upon the regular payment of these "gratuities." The inference is buttressed by the testimony regarding the training information passed to the institutions' employees which reflects that the custom of paying the "gratuities" was well established in the business community.[2] Any remaining doubt concerning the deontic nature of the extra payments was put to rest by appellant's statement to Olk that if her bank did not "do something" about the cessation of the "gratuity" payments, the bank's work "would not get done."

■ Regarding appellant's second argument, appellant concedes that in return for his salary from the Torrens office, it was his obligation to render *all* customers prompt and good service, and that the reasonable value of the services he rendered was equal to the statutory portion of the "charges" he imposed. Therefore, appellant must have accepted the extra payments for something other than rendering his settlement services. Appellant cannot avoid liability under § 2607(b) simply by refusing to perform his mandated duties unless he is given a "gratuity," and thus claiming that he was "performing a real estate settlement service" in return for the extra payments.

The difficulty the panel focused upon in the original opinion concerned the construction of the phrase "received for". In essence, the panel concluded that it would be impossible for a single individual to violate § 2607(b) because he could not both accept a portion of the charge "*received for*" the rendering of real estate settlement services, and also accept the same charge "*other than for*" services actually performed." If the services were not performed, the panel held, the charge could not have been received "for" the performance of those services. We think this construction of § 2607(b) is too restrictive.

■ Although it is true that, in general, a criminal statute must be strictly construed, *United States v. Campos-Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) (citation omitted), it is also a well established rule of statutory construction that a court will presume against interpreting a statute in a way that will render it meaningless or ineffective. *FTC v. Manager, Retail Credit Co., Miami Branch Office*, 515 F.2d 988, 994 (D.C.Cir. 1975) (citations omitted). In this case, not only does the panel's interpretation conflict with what we believe was the Congressional intent behind § 2607, but it also renders the statute ineffective in achieving even what the appellant contends is the more narrow Congressional intent.

■ Appellant claims that Congress did not intend § 2607(b) to apply to additional payments such as the one at issue in this case. Rather, he argues that the statute was intended to apply only to the practice some real estate companies had of splitting

---

**2.** The conclusion that the practice was widespread is further supported by the fact that the Government has secured the conviction of several other countermen for violating § 2607(b) by accepting these extra payments. *United* *States v. Pawelek*, No. 70 CR 498 (N.D.Ill. 1979); *United States v. Snow*, No. 70 CR 500 (N.D.Ill.1979); *United States v. Nadjari*, No. 70 CR 501 (N.D.Ill.1979).

the charges they received for performing real estate settlement services with individuals who performed no service for the company's customers in return. This split was usually intended to serve as compensation for the referral of business. Appellant relies in this argument on the subtitle of subsection 6(b), "Splitting Charges," upon the examples in the legislative history of § 2607 and the HUD regulations interpreting the section. Both of these latter sources do, in fact, discuss only splitting scenarios and we fully agree with appellant that the splitting arrangement was foremost in Congress' mind when it enacted RESPA and specifically § 2607(b). We disagree, however, that § 2607(b) was intended to deal with that problem exclusively.

Notwithstanding the examples in the legislative history and the regulations, the overall purpose of § 2607 was set forth more broadly in Senate Report No. 93–866, May 22, 1974, which reported out of committee the bill that eventually became § 2607. That report succinctly stated that one of the purposes of the bill was "to eliminate the payment of . . . unearned fees in connection with settlement services provided in federally related mortgage transactions, and for other purposes . . . ," 1974 U.S.Code Cong. & Ad.News 6546, 6548, 6554, and characterizes subsection (b) as prohibiting the "acceptance of *any* portion of *any* charge for the rendering of a real estate settlement service other than for services actually performed." *Id.* at 6556 (emphasis added). While the title of a section of a statute should not control or vary the plain meaning of the statute itself, nevertheless the title of § 2607, "Kickbacks and Unearned Fees," appears to fortify the position that the Congressional intent was for a broader application than that ascribed to it by the appellant. Congress' aim was to stop *all* abusive practices that unreasonably inflate federally related settlement costs to the public. *Id.* at 6547, 6548. Although the focus of immediate Congressional concern may have been the splitting of fees between the recipient of the charge and unrelated third parties, the arrangement we view here is no less an example of

an "abusive practice" or imposition of an "unearned fee," unreasonably increasing the cost of settlement services to the banks, and ultimately to the public at large. As stated previously, appellant concedes that the reasonable value of the services he rendered was equal to the statutory portion alone of the "charge" he levied. It should be noted in this regard that the Senate report stated: "To the extent that the payment is in excess of the reasonable value of the . . . services performed, the excess may be considered a kickback or referral fee proscribed by section 7 [§ 2607]." *Id.* at 6551.

■ At best, the *bank employees* were receiving a benefit in the form of expedited service. The cost for this service, however, was ultimately being paid by the bank's customers in return for a benefit that at most could be described as speculative or tangential. We think this conduct was within the Congressional concern manifested by § 2607(b). The fact that appellant kept the entirety of the extra payments instead of passing a portion of them along to an unrelated third party does not, in our opinion, render his conduct less abusive or insulate him from liability under that statute.

■ Given the Congressional goal of protecting the public from abusive practices that unreasonably inflate settlement costs, we see no reason to overturn the district court's construction of § 2607(b) that achieves this objective. We believe a single individual *can* violate § 2607(b) by receiving in his official capacity a "charge" for the rendering of settlement services, but personally keeping a portion of the charge in fact for something other than the performance of those services. In this case, appellant in his official role imposed and received a "charge" that incorporated not only a statutorily imposed segment, but also a "gratuity" that was ostensibly required by appellant in order to get the services properly performed. At the same time, because the prompt service was already due the bank employees under state law once

the statutory fee was paid, the extra payment must have been accepted in fact for something "other than services actually performed." This conduct violated § 2607(b). The panel's construction of the statute has an additional difficulty. Even if we were to assume a more narrow Congressional intent behind § 2607, that is, an attack solely upon the "splitting" situations, the panel's construction would not achieve Congress' desired result. The two-party scenario, no less than the one-party situation we review here, is a potential victim to a construction that technically defines the phrase "receive for." In the two-party situation, the real estate company employee, or counterman, would receive a "charge" "for the performance of real estate settlement services." However, because he would pass along a portion to a third individual who did nothing for the customer in return, neither the total charge nor the portion passed along would be within the panel's narrow definition of § 2607(b). Because nothing was performed for the customer in return for at least part of the charge, that portion of the charge could not have been received "for" the performance of real estate settlement services. The remaining portion, on the other hand, *would* have been received in return for the services; yet that portion would also not be subject to § 2607 because actual services were performed in its return. Under the panel's construction, therefore, the statute would be rendered meaningless, except possibly in those rare instances where the unreasonably inflated charge is officially sanctioned. We do not believe such a construction is desirable or necessary in this case and thus adopt the district court's construction which achieves Congress' intent.[3]

### III

■ Appellant also challenges § 2607 as being unconstitutionally vague. Although it is true that a statute which sets forth its provisions in terms so vague that individuals "of common intelligence must necessarily guess at its meaning ... violates the first essential of due process of laws," *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), we do not find that this principle has any application here. Our interpretation of § 2607(b) is a logical application of the Congressional policies underlying RESPA, *see United States v. Chiarella*, 588 F.2d 1358, 1369 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and the fact that no prior case has involved the precise fact situation we address here is not dispositive. All that is necessary is that a "clear and definite statement of the conduct proscribed antedate" the action alleged to be criminal. *United States v. Persky*, 520 F.2d 283, 288 (2d Cir. 1975). We hold that this standard was met in this case.

"In determining the sufficiency of the notice a statute must of necessity be examined in light of the conduct with which the defendant is charged." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963); *diLeo v. Greenfield*, 541 F.2d 949 (2d Cir. 1976). "Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his conduct is proscribed." *National Dairy, supra* 372 U.S. at 32–33, 83 S.Ct. at 597–598 (citation omitted). In this case, appellant certainly knew from the sign in the Torrens office and the statement he signed that his practice of accepting the extra payments was improper and that the extra payments were not "bona fide." Thus, he cannot claim that he was unfairly surprised that his conduct was illegal, only that it was proscribed under this specific statute. It is well established, however, that in light of the strong presumption of validity that attaches to Acts of Congress, the fact that individuals may differ regarding whether or not certain marginal of-

---

**3.** The only district judges that have addressed the question of whether or not § 2607(b) applies to this situation are in accord with our interpretation. *United States v. Pawelek*, No. 70 CR 498 (N.D.Ill.1979); *United States v. Snow*, No. 70 CR 500 (N.D.Ill.1979); *United States v. Nadjari*, No. 70 CR 501 (N.D.Ill.1979).

fenses fall within a specific statute's terms does not by itself render the statute unconstitutional. *Id.* at 32, 83 S.Ct. at 597. Furthermore, this case has not presented any potential for discretionary enforcement of the statute, nor have the facts shown that the statute has been arbitrarily or discriminatorily invoked. *Int'l Society for Krishna Consciousness, Inc. v. Rochford*, 585 F.2d 263, 267 (7th Cir. 1978). We find, therefore, that § 2607(b) is sufficiently definite to pass constitutional muster.

## IV

Appellant next challenges the sufficiency of the Government's evidence, claiming that the Government failed to prove that the "gratuities" were actually paid by the bank's customers, and that it failed to prove that appellant knew that the extra payments were paid by the bank's customers.

Regarding appellant's first complaint, the Government established that many of the extra payments were passed on directly to the bank's customers, and when the evidence is viewed most favorably to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), it is a reasonable inference that the remaining payments also were passed on to the customers at least indirectly. Furthermore, appellant has failed to support his implication that the banks, when they were representing their customers, were not themselves members of the "public" as that term is used in the legislative history of § 2607.

As to the second element of appellant's argument, we have found no support in the legislative history for the contention that the Government's burden in a § 2607 prosecution includes a showing that appellant *knew* that each payment was being passed on directly to the bank's customers. *Contra, United States v. Pawelek*, No. 79 CR 498 (N.D.Ill.1979). Congress' intent was to make illegal any abusive practice that unreasonably inflated the cost of real estate settlement services to the public. The fact

that appellant may not have had knowledge as to whether or not specific payments were passed on directly to the bank's customers does not render his acceptance of the extra payments less abusive, or have a bearing upon whether or not the bank's customers eventually bore an increased and unwarranted cost. Because the ultimate source of the bank's funds was its customers, a sense of realism alone should have informed appellant that the customers would eventually bear the cost of the extra payments. We hold this is sufficient to meet any degree of knowledge required under § 2607(b).

## V

Appellant's final challenge is based upon the disparity between the sentences imposed upon him and the other countermen in related prosecutions. *See Pawelek, supra, Snow, supra,* and *Nadjari, supra.* This court will not infringe upon the trial court's discretion in sentencing absent a clear showing of gross abuse of that discretion. *United States v. Mitchell*, 625 F.2d 158, 162 (7th Cir. 1980), *cert. denied*, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247. A sentence generally will not be reviewed if it is within the statutory limits, *id.; United States v. Dorzynski*, 418 U.S. 424, 440–41, 94 S.Ct. 3042, 3051, 41 L.Ed.2d 855 (1974) (citations omitted), and "disparity in sentences is not a predicate for appellate review." *United States v. Amick*, 439 F.2d 351, 371 (7th Cir. 1971), *cert. denied*, 403 U.S. 918, 91 S.Ct. 2227, 29 L.Ed.2d 694. The record in the instant case reveals that the trial judge was fully aware of the other RESPA sentences and considered only the facts of the case before him. The sentence also was within the statutory limitations of RESPA. In these circumstances, we will not disturb the district court's discretion.

Affirmed.

CUDAHY, Circuit Judge, dissenting, in which SWYGERT, Circuit Judge, joins:[1]

From all appearances, Gannon may be guilty of accepting bribes or perhaps of

1. The panel to which the majority refers as having originally decided this case consisted of

Circuit Judges Swygert and Cudahy and Senior District Judge Robert A. Grant of the Northern

committing acts of extortion. From all appearances, he should be charged under an appropriate rule or statute. Unfortunately, the plain language of RESPA precludes his being legitimately prosecuted under that statute.

At trial in this case the Government argued that in addition to scienter, it must prove the following elements to establish that Gannon violated Section 2607:

(1) that the defendant accepted a portion of the charges received by him,

(2) that the charges were for the rendering of a real estate settlement service,

(3) that the settlement involved a federally related mortgage loan and

(4) that the portion was other than for settlement services actually performed.

Government's Trial Memorandum of November 29, 1979, pp. 9–10 and Appellee's Brief, p. 21. The Government has argued throughout that these elements are requisite, and the majority accepts this position.

But merely to recite these elements is to demonstrate conclusively the irrationality of the Government's position. On the one hand, the Government recognizes in elements (1) and (2) that it must prove that the money Gannon kept for himself ("accepted") was part of funds he received for rendering a specific service (a real estate settlement service). But in element (4) the Government indicates it must somehow prove that the money ("portion") the defendant kept for himself was "other than for settlement services actually performed." Thus the position of the Government and of the majority here is logically inconsistent and indefensible because the money Gannon accepted must, in reality, either be part of the charges he received for settlement services rendered or be "other than" the charges for settlement services rendered. But these two categories are mutually exclusive; the money cannot be both part of and "other than" such charges.

District of Indiana, sitting by designation. The panel decision was unanimous.

The majority attempts to evade this very fundamental problem by asserting that the "reasonable value" of Gannon's services was equal to only the statutory portion "of the 'charge' he levied." At 437, 438. But what the "reasonable value" of the services might have been is, under the circumstances here, wholly irrelevant. The majority's assertion merely restates the legal conclusion that the charge for Torrens service set by law is by definition "reasonable." The majority is simply left to argue that the excess payment or "reasonable value" is a payment for some additional unspecified and unidentified "something." At 437. This analysis is really consistent *in economic terms* only with the absurd conclusion that the excess over "reasonable value" is a pure gift (presumably generously conferred on Gannon by the banks).[2] But the facts of the matter are quite different. For the banks in fact decided that *more* than the statutory fee *had* to be paid in order to obtain satisfactory and "prompt" service. Following this decision, the banks paid the additional money and received the satisfactory settlement service for which they made the payment. Reality will allow no other conclusion than that if "the defendant accepted a portion of the charges received by him," the "portion" accepted was "for settlement services actually performed." This being the case as a matter of simple economics, it is impossible for the Government to have proved (1) and (2) of its proposed elements of the offense without having conclusively disproved (4).

One may plausibly wonder why the plain language of RESPA is so ill-suited to prosecution of Gannon's acts when his activities might arguably contribute in some degree to higher-than-necessary real estate settlement costs. The answer is relatively simple. RESPA was drafted having in mind the paradigmatic situation of, for example, the lawyer who refers business to a title company in exchange for payments to him by the company out of funds paid to the

2. In economic terms, value is equivalent to price and an increment above value is necessarily gratuitous.

title company for the performance of actual real estate settlement services. In all the examples contained in the HUD regulations implementing Section 2607, the recipient of the illegal payments does in fact perform a "service" (the additional "something" for which the majority searches here in vain) by way of referring business to, or placing business with, a preferred title company, lawyer or other performer of settlement services.[3] The ilegality under RESPA simply consists of giving or accepting payments for, e.g., referral or placement services out of funds paid for real estate settlement services, when the payee actually performs no settlement services. This is the sort of evil (payments for what in fact are referral services out of funds paid for settlement services) to which the statutory requirements of RESPA are fitted—requirements which unfortunately do not fit the present circumstances of payment (albeit improper or illegal) for the very services which are in fact performed.

This analysis fully answers the majority's contention that Gannon "must have accepted the extra payments for something other than rendering his settlement services." (At 437). The majority does not suggest what this other "something" is. In fact, it cannot because there is no other "something." *But*, in the situations the statute is designed to fit, the other "something" is the referral or placement of business (or similar activity). Gannon is simply not in a position to favor anyone with his (or someone else's) business.[4]

This analysis also fully meets the majority's concern that my construction of the statute would render it "meaningless". In any situation where payments for referral or placement of business (or similar activity) are made to persons or entities which perform no settlement services out of funds paid for real estate settlement services (and these are the only sorts of situations addressed by the HUD regulations), my analysis would fully support prosecution and conviction. Section 2607 makes eminently good sense and will work well in the context of the evils it was designed to address. It will not, however, fit the present situation, where a gratuity or bribe is being paid to a public official to properly perform his assigned duty and where he is in no position to do any other favor (such as referring business) for the person paying the gratuity or bribe.

In addition to the fundamental problem I have discussed, there is at least one other major difficulty in sustaining this conviction. Under the majority's approach, it is necessary to find in the first instance that the "gratuities" or "bribes" paid to Gannon were "part of a charge for real estate settlement services." Certainly, it requires a powerful massaging of the English language to convert payments which are *in addition to* a published statutory charge into "parts" or "portions" of the charge itself.[5] Even if this act of semantic contor-

---

**3.** The regulations list the following examples of violations of Section 2607:

    (1) A title company pays a portion of the title insurance premium to a person who performs no services for the title company other than placing an application with the title company.

    (2) A title company gives a discount or allowance for the prompt payment of a title insurance premium or other charge for a settlement service to a real estate agent, attorney or lender as a rebate for the placement of business with such title company.

    (3) An attorney gives a portion of his fees to another attorney, a Lender or a real estate agent who only referred a prospective client to the attorney.

    (4) A title company pays a "commission" to a corporation that is wholly owned by one or more Lenders, even though such corporation performs no substantial services on behalf of the title company.

24 C.F.R. § 3500.14(g) (1980).

**4.** The majority also suggests that the basic dilemma to which I advert can be cured by assigning the *benefit* of Gannon's satisfactory service to the *bank employees* (and by implication) not to the bank customers. Even accepting this imaginative but highly dubious analysis as to the beneficiaries of the service, the argument does nothing to address the point that Gannon did in fact receive money "for settlement services" which he "actually performed."

**5.** The majority suggests that if its interpretation is not followed, the application of Section 2607 in "splitting" or "kickback" situations (in

tion can be successfully performed, one simply arrives at the dead end that the services for which the charge is paid are without question the very same services which are actually performed. And the statutory requirements are thus not met.

I therefore respectfully dissent.

See also D.C., 466 F.Supp. 745; 7 Cir., 653 F.2d 292.

contrast to "gratuity" or "bribe" situations) might be frustrated. (*See* At 439). I think again the majority ignores the virtues of plain language. A "charge" once paid to a title company, for example, is no less a "charge" because part of it is kicked back to a lawyer for referring business. Arguable failure of consideration as to part of the payment does not affect the *purpose* for which the payment was made.