UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert S. CHAPPELL,
Defendant-Appellant.

No. 82–1382.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1982.

Decided Jan. 14, 1983.

Rehearing Denied Feb. 10, 1983.

Certiorari Denied May 16, 1983.
See 103 S.Ct. 2095.

Richard J. Darko, Indianapolis, Ind., for defendant-appellant.

Roger L. Duncan and Thomas W. Turner, Asst. U.S. Attys., Indianapolis, Ind., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and MAROVITZ,[*] Senior District Judge.

MAROVITZ, Senior District Judge.

Appellant, Robert S. Chappell, appeals a two count conviction for mail fraud, 18 U.S.C. § 1341.[1] Chappell allegedly devised and carried out a scheme to defraud investors in his company, General Oil, Inc., by making certain specific misrepresentations concerning the use of the funds invested and potential returns. Count I of the indictment set forth the alleged scheme to defraud which was then incorporated by reference into each of the remaining ten counts.[2] Each count pertained to a different investor and each count alleged a specific mailing.

A jury convicted Chappell on Count 10 which concerned a letter from Chappell addressed to Gene and Lloyd Sellers, and on Count 11 which concerned a letter from Chappell to Andrew Hasenour. Both letters were dated April 14, 1977. On appeal, Chappell contends: 1) that insufficient evidence was presented at the trial to convict him of the crime of mail fraud; and 2) that

the trial judge erred in admitting into evidence certain documents purporting to be the books and records of Chappell's corporation, and in permitting the District Attorney to read to the jury portions of a transcript of an interview with a deceased former employee of the corporation. After a full review of the record, we find Chappell's arguments to be without merit and therefore affirm his conviction.

*Facts*

In March 1975, Chappell formed General Oil, Inc., under the laws of the State of Indiana. Shortly thereafter, he purchased the oil and gas rights to a 150 acre tract of land located in Warren County, Pennsylvania from Maurice Dickey. There were regularly producing oil wells located all around the tract of land and it was regarded as a likely location for the production of oil. Chappell then filed a Schedule D offering with the Securities and Exchange Commission (the "SEC") concerning the first oil well to be drilled. Basically, a Schedule D is a question and answer form intended to provide information to potential investors in regard to the project. After the SEC approved the Schedule D, Chappell began to sell interests in the future oil wells. Each investor received a copy of the Schedule D and signed a copy of the Operating Agreement, which is the agreement between General Oil and each individual investor. Under the terms of the Schedule D and the Operating Agreement, investors bought only an investment in the oil wells, and did not become a shareholder in General Oil or

---

* The Honorable Abraham Lincoln Marovitz, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. 18 U.S.C. § 1341 provides:
 "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail

according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. The original indictment charged 12 counts of mail fraud and 3 counts of inducing persons to travel in interstate commerce in execution of a scheme or artifice to defraud. 18 U.S.C. § 2314. Prior to trial 4 counts were dismissed, leaving 10 counts charging mail fraud and 1 count charging the inducement of persons to travel in interstate commerce.

entitled to any of the profits of the corporation.

The tract of land was large enough for thirty wells and investors were told that thirty wells would be drilled. Only ten wells were ever drilled. Nine of the wells produced oil, but only in very small quantities.

In March 1976, the SEC began an investigation of General Oil and Chappell, and eventually insisted that a separate Schedule D be filed for each well drilled. The SEC later began a civil action in the Southern District of Indiana, and in July 1976 Chappell and General Oil agreed to the entry of a consent decree whereby no new investors would be sought for the project.

There is no question that corporate funds were used to purchase commercial real estate in Indiana for the purpose of opening a business to sell fine art. Chappell also transferred to General Oil a motel located in Little Rock, Arkansas which he had purchased prior to starting the corporation. The motel was carried on the books and records of the corporation and corporate funds were expended on it. Chappell also wrote checks on the corporate checking account for personal and family expenses including support payments to his wife. The books and records of General Oil apparently accurately reflected these expenditures which were charged to Chappell personally.

In April 1977, the SEC renewed its investigation of Chappell. On April 21, 1977, representatives of the SEC took Chappell's testimony, and at that time he indicated that certain books and records of the corporation were in the possession of Anthony Ricci, who was located in Florida.

On May 2, 1977 representatives of the SEC's Florida office took testimony from Ricci. They also received the books and records of the corporation that were in his possession. At Chappell's trial, these books and records were received into evidence, over objection, as Government Exhibits 16A–K. Portions of Ricci's testimony as given to the SEC were read to the jury, but the transcript itself (Government Exhibit 16L) was not admitted as evidence. Ricci had died over a year before trial.

### Sufficiency of the Evidence

Chappell first contends that the evidence pertaining to the counts on which he was acquitted may not form the basis for inferences against him on Counts 10 and 11. He claims that the convictions on Counts 10 and 11 must stand or fall on their own weight and that there was insufficient evidence presented on those counts to support a conviction. Basically, Chappell claims that the mailings alleged in Counts 1 through 9 covered a time span up to and including April 12, 1977, and that his acquittal on those counts shows that the jury felt that there was no scheme to defraud up to that period in time. Therefore, Chappell argues that it is logically inconsistent for the jury to convict him on Counts 10 and 11 since the mailings alleged in those counts occurred just two days later on April 14, 1977. Chappell offers no support for this theory and in fact this precise argument was rejected in *United States v. Reicin*, 497 F.2d 563 (7th Cir.1974).

As the *Reicin* court so aptly stated, "[t]his assault by defendant on his conviction stems primarily from his narrow view of a mail fraud charge . . . ." *Id.* at 567. Chappell has not viewed the evidence as a whole or in the light most favorable to the Government and has generally ignored the function of the jury in a criminal trial. The evidence presented concerning the various investors overlaps and cannot be viewed in a vacuum. *See United States v. Hutul*, 416 F.2d 607, 617 (7th Cir.1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970). The fact that the jury acquitted Chappell on nine of the eleven counts does not mandate the conclusion that the jury determined that there was no overall scheme to defraud investors. In analyzing the verdict, Chappell has failed to take into account the possibility that the jury might have been exercising "its historic power of lenity." *United States v. Carbone*, 378 F.2d 420, 423 (2nd Cir.1967), *cert. denied*, 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967).

As pointed out in *United States v. Fox,* 433 F.2d 1235, 1238 (D.C.Cir.1970), "juries frequently convict on some counts but acquit on others, not because they are unconvinced of guilt, but simply because of compassion or compromise." Chappell has invited us to speculate as to why the jury acquitted him on the first nine counts and yet convicted him on the remaining two counts. We decline to do so, for such speculation cannot overturn a verdict. *Dunn v. United States,* 284 U.S. 390, 394, 52 S.Ct. 189, 191, 76 L.Ed. 356 (1932).

Chappell also contends that the mailings alleged in Counts 10 and 11 were mailed after any alleged scheme reached fruition and therefore they were not mailed for the purpose of executing a scheme to defraud as required by the statute. Chappell argues that the letters were mailed after he received the money from the investors involved, and therefore the scheme to defraud had already been completed at the time of the mailing.

 This argument is wholly without merit. The April 14, 1977 letters gave the investors a status report on the production of oil over the winter, and also stated that any action to sell the oil lease was being postponed due to the prospect of an increase in the price of oil. Precedent has established that the use of the mails to "lull" victims into a false sense of security may be "for the purpose of executing" a scheme to defraud, even though the mailings were made after the money had been fraudulently obtained. *United States v. Shelton,* 669 F.2d 446 (7th Cir.1982); *United States v. Wrehe,* 628 F.2d 1079 (8th Cir. 1980). After viewing the documents and the circumstances surrounding their mailing, we are satisfied that sufficient evidence was presented for a jury to construe them as "lull" letters designed to mislead the investors into a false sense of security.

### Alleged Trial Errors

Chappell maintains that the trial judge erred in admitting the books and records of General Oil into evidence and in permitting the Government to read to the jury portions of Ricci's testimony to the SEC. Specifically, Chappell claims that both the documents and the testimony constituted inadmissible hearsay and that their admission violated the Confrontation Clause of the Sixth Amendment.

At trial, the Government argued that the books and records were admissible under the Federal Rules of Evidence ("FRE") 804(b)(5) and 803(24) which are the catch-all exceptions to the hearsay rule, and under 803(6) which is the exception allowing the introduction of business records. The trial court, after a lengthy hearing, admitted the documents under FRE 803(6), 804(b)(5), and 801(d)(2)(D) which defines admissions by a party-opponent through an agent as not hearsay. Ricci's testimony to the SEC was also admitted under Rule 801(d)(2)(D). At oral argument, counsel for the Government relied on Rule 803(6) as the basis for the admissibility of the documents and therefore we will limit our discussion to that rule.

FRE 803(6) classifies business records as admissible hearsay if they are kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the records, as shown by the testimony of the custodian or other qualified witness. The records are not to be admitted however, if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. Fed.R.Evid. 803(6).

Chappell argues that the records were not admissible under Rule 803(6) because there was no showing that they were reliable or trustworthy. Actually, Chappell does not dispute the reliability of the records, only the Government's ability to lay a proper foundation for them since Ricci, the custodian, had died prior to the trial.

 To support the reliability of the records, the Government offered the testimony of two former employees of General Oil who both stated that Ricci was the bookkeeper for the company. SEC agent Paul testified that Chappell told him that Ricci was maintaining the books of General

Oil. Paul also testified that he was a licensed Certified Public Accountant and that he examined the books and records obtained from Ricci and that they appeared to be records made in the ordinary course of business. He further testified that he corroborated the information contained in the books and records with checks, bank statements and other records and found that all the entries appeared accurate. Finally, and most importantly, the Government offered portions of Ricci's testimony as given to the SEC in May 1977. In that testimony Ricci stated that he was the accountant for General Oil and that he maintained the books and records. He also identified each of the exhibits and described how he posted entries and prepared schedules. This testimony was clearly admissible under FRE 801(d)(2)(D). That rule defines as not hearsay any admission by a party-opponent through his agent concerning a matter within the scope of the agency, if made during the existence of the relationship. While it is true, as Chappell asserts, that Ricci was no longer on the General Oil payroll at the time that he gave testimony to the SEC, he was nonetheless still acting as General Oil's bookkeeper. Only twelve days prior to Ricci's testimony, Chappell himself told the SEC that Ricci was still acting as General Oil's accountant and that the books and records were still in Ricci's possession. Ricci's testimony, properly admitted as an admission by a party-opponent, laid the foundation for the admission of the General Oil books and records. Chappell's allegations of error regarding the admission of the documents and the testimony are therefore without merit.

Chappell's final argument is that regardless as to whether the records and testimony were admissible under various exceptions to the hearsay rule, their admission violated his Sixth Amendment right to confrontation.

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court reviewed the overlapping character of the hearsay exceptions and the Confrontation Clause. The Court noted that the Confrontation Clause countenances only hearsay testimony which is marked with trustworthiness. As summarized by Justice Blackmun,

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that [the declarant] is unavailable. Even then, [the declarant's] statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66, 100 S.Ct. at 2534 (footnote omitted).

■ In view of Ricci's death prior to the trial, there can be no question as to the unavailability of the hearsay declarant. The books and records clearly fell within a firmly rooted hearsay exception and reliability can be inferred as to them. Ricci's testimony, as a party admission, does not fall into a hearsay exception but rather is defined as not hearsay. Fed.R.Evid. 801(d)(2)(D). The exclusion of party admissions from the definition of hearsay, unlike most hearsay exceptions, is not grounded on a probability of trustworthiness but rather on the idea that a party cannot object to his failure to cross-examine himself. *See* 4 Weinstein and Berger, *Weinstein's Evidence* ¶ 801(d)(2)[01] (1981). Therefore, in the case of an admission by an agent, a separate Confrontation Clause analysis would appear to be necessary. This Court has repeatedly held however, that extrajudicial statements properly admissible under FRE 801(d)(2)(E) (admissions by coconspirators) do not violate a defendant's Sixth Amendment rights. *United States v. Papia,* 560 F.2d 827, 836 n. 3 (7th Cir.1977). The similarities between coconspirators and agents are readily apparent, and we see no reason to differentiate between them for Confrontation Clause analysis purposes. In any event, there clearly were adequate indicia of reliability surrounding Ricci's testimony. He gave his statement under oath,

and it was recorded by a qualified court reporter. Although the reporter did not certify the transcript, the SEC attorney who questioned Ricci testified at the trial as to the reliability of the transcript. And while it is also true, as Chappell asserts, that Ricci was not subject to cross-examination, there is absolutely no reason to suspect that Ricci did not tell the truth. Chappell cannot point to any prejudice that resulted from the admission of Ricci's testimony, and has never questioned the accuracy of the books and records. Indeed, Chappell has steadfastly maintained that the records accurately reflect his personal transactions. Under these circumstances, we cannot conclude that Chappell's Sixth Amendment rights have been violated.

### Conclusion

Although Chappell has presented resourceful arguments, he has been unable to convince us that there was insufficient evidence to convict him or that inadmissible evidence was allowed to reach the jury. Accordingly, the conviction is affirmed.

AFFIRMED.