**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William A. CROFT,**
**Defendant-Appellant.**

**No. 83-3168.**

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1984.

Decided Dec. 14, 1984.

Rehearing and Rehearing En Banc
Denied Feb. 12, 1985.

Dumbauld, Senior District Judge, sitting by designation, filed a concurring opinion.

John R. Byrnes, U.S. Atty., Madison, Wis., for plaintiff-appellee.

Janice A. Rhodes, Shellow, Shellow & Glynn, S.C., Milwaukee, Wis., for defendant-appellant.

Before PELL and COFFEY, Circuit Judges, and DUMBAULD, Senior District Judge.*

COFFEY, Circuit Judge.

The defendant-appellant, William Croft, appeals his conviction for one count of knowingly and unlawfully converting, to his own use, a "thing of value" of the Environmental Protection Agency (the services of Laurel Johnson), in violation of 18 U.S.C. § 641 (1982). We affirm.

**I**

The record reveals that in June 1980, the defendant, William Croft, was employed as an assistant professor in the Department of Veterinary Sciences at the University of Wisconsin-Madison. As a result of his extensive research in the area of urinary bladder cancer in animals, Croft had developed an interest in the carcinogenic (cancer causing) effects of asbestos. On June 30, 1980, Croft submitted a grant proposal to the Environmental Protection Agency ("EPA") outlining a research project "to examine mesothelioma in dairy calves as a potential monitor for asbestos and as an index of the extent of environmental hazard from exposure to asbestos." Mesothelioma is a cancerous tumor that often develops in the abdominal and chest areas of humans and animals after exposure to asbestos. Historically, the incidence of mesothelioma in dairy calves is rare, however, according to Croft's EPA proposal there were seven cases of the disease reported between January 1, 1977 and December 31, 1978, at a meat packing plant in Edgar, Wisconsin. In light of this evidence, Croft planned to obtain cancerous cattle tissue from area meat packers and test that tissue for mesothelioma. If the test proved positive, the cattle would be traced to their farm of origin where the water supply and cattle feed would be analyzed for asbestos content.

In September 1980, the EPA approved Croft's proposal and forwarded $130,991 in grant funds to the Office of Research Administration at the University of Wisconsin-Madison. The University held the funds in a special EPA account (UW Fund Account Number 144–Q386) and agreed with the EPA to disburse those funds only for expenses incurred during the course of the two-year EPA research project. The EPA designated Croft as the "principal investigator," or coordinator of the project, responsible for supervising and contributing expert research, as well as submitting

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

semi-annual progress reports to the EPA. *See, e.g.,* 40 C.F.R. § 30.135–19. Following the University's receipt of the EPA funds, Croft immediately began his search for a project specialist to assist him in the EPA study.

Some five months later, in January 1981, Croft became involved in a separate and completely independent asbestos research project. While visiting his hometown of Crivitz, Wisconsin, Croft learned that town officials in nearby Weston, Wisconsin were concerned about a possible asbestos problem in the Weston water system. The town's Department of Public Works had evidence that the underground water pipe, made of cement and asbestos, was corroding and releasing asbestos fibers into Weston's water supply. Croft arranged a meeting with the Weston attorney and the director of Public Works to discuss the twenty-three miles of concrete pipe that carried water to the residents of Weston. At the meeting, Croft informed the Weston representatives of his experience in asbestos-related research and his ability to perform the highly technical and scientific experiments needed to ascertain the asbestos content in the town's water supply.

In that same month, January 1981, Croft completed his search for a project specialist on the EPA-funded study, hiring Nijole Caplenas, a recent graduate from the University of Wisconsin with a Masters degree in microbiology medicine, to aid him in collecting and analyzing data for the two-year project. Caplenas' duties initially consisted of performing water chemistries (including tests for the pH factor, alkalinity, hardness, and aggressiveness index) and learning the proper method of analyzing water samples to determine their asbestos count.[1] The detailed, time-consuming process of counting asbestos fibers involves the filtering of a water sample through alcohol soaked filtration paper, carbon coating the paper onto a slide, ashing the slide (burning away unwanted residue), placing the slide

under an electron microscope, and counting the number of asbestos particles appearing upon the slide. Between January and March of 1981, Caplenas performed water chemistries and analyzed various water samples for their asbestos count, including some preliminary water samples that Croft obtained from the town of Weston. In addition, Caplenas visited numerous meat packing facilities throughout Wisconsin, obtaining samples of cancerous cattle tissue and testing them for mesothelioma.

In March 1981, Croft again traveled to Weston, Wisconsin; this time to meet with the town board and discuss his proposal for measuring the level of asbestos in the town's water supply. Croft assured the board that he was well-trained in asbestos research and capable of performing the highly technical process of counting asbestos particles. Croft further informed the board that he had received permission from his superiors at the University of Wisconsin-Madison to conduct the Weston research project and to use the University's advanced research facilities, on the condition that he reimburse the school for their expenses. The following month, in April 1981, the town board hired Croft at a fee of $75.00 an hour, to complete a thorough test of the asbestos content in the Weston water supply by September 1, 1981. The town's attorney requested that Croft personally perform all of the research and scientific procedures because in the event of a lawsuit against the concrete pipe manufacturer, Johns-Manville Corp., Croft would have to substantiate his expert data and account for the water samples' chain of custody at trial.

Following the meeting in April with the Weston town board, Croft returned to the University of Wisconsin-Madison and informed Caplenas, the EPA project specialist, that additional water samples would be arriving from Weston for her to analyze. Caplenas responded that she was busy examining cancerous cattle tissue for the.

---

1. The aggressiveness index is used to calculate the rate at which water will corrode concrete pipes consisting of cement and asbestos, thereby causing the release of asbestos fibers into the water system.

EPA project and did not have the time to perform either the water chemistries or the asbestos counts for the Weston project. During this same time period, in April 1981, Croft employed the services of James Williams to also assist in the EPA study. Croft assigned Williams, a journalism student who had been working for Croft on an unrelated research project that was nearing completion, to review scientific periodicals for asbestos studies and articles.

In June 1981, Laurel Johnson, an undergraduate student in the animal sciences program at the University of Illinois-Champaign who was living in Madison, Wisconsin for the summer, contacted Croft concerning her interest in obtaining research-related summer employment. According to Johnson, Croft explained that he had an opening for a research assistant to perform water chemistries and analyze water samples taken from Weston, Wisconsin. Johnson accepted Croft's offer and was employed from June to mid-August of 1981, during which time she performed water chemistries on the Weston water samples, analyzed the asbestos count of those samples, and recorded the results in a laboratory log book. In early August 1981, Croft asked Johnson if she would remain in Madison for the upcoming fall semester in order that she might complete her research on the Weston water samples. Johnson declined the offer and returned to the University of Illinois-Champaign. Following Johnson's return to Illinois, Croft directed James Williams to educate himself in the scientific procedures and techniques required to perform water chemistries and asbestos counts. According to the University of Wisconsin payroll records, Johnson received $1,988.45 from the special EPA account for her summer research assistance on the Weston asbestos research project.

Throughout the summer of 1981, the Weston officials pressured Croft for the results of his asbestos tests, as the residents of Weston were aware and fearful of the possible carcinogenic problem in the town's water supply. *See, e.g.*, The Daily Herald, Wausau-Merrill, Wis., February 11, 1982, at 19. Croft explained that his test results were delayed because he had to personally perform the time-consuming water filtration and asbestos count for each water sample. Croft failed to complete the Weston project by the September 1, 1981 deadline, and during the following months of September and October the town attorney repeatedly requested that Croft provide the town board with progress reports. Finally, on October 29, 1981, Croft submitted water chemistries of 134 water samples, asbestos counts for twenty-three of those samples, and other pertinent data, to the town board.[2] Included in the data submitted by Croft were five pages of water chemistry calculations that Laurel Johnson had performed on Weston water samples during her summer employment.[3]

The following month, in November 1981, James Williams was forced to withdraw from his research position, due to a recurring physical illness. As a result of his employment with Croft, Williams earned $13,685.00 during 1981 and according to the University of Wisconsin payroll records, a substantial amount of that payment was made from the special EPA account. Sometime during the fall of 1981, Croft telephoned Laurel Johnson at the University of Illinois, asking "if [she] had been contacted by anyone from the University [of Wisconsin] ... [r]egarding the summer work ...." Johnson responded that she had informed an auditor from the University of Wisconsin that she "had been doing work for the summer for Dr. Croft." In February 1982, Nijole Caplenas resigned from her position as the project specialist for the EPA study in order that she might pursue new career objectives. According to the University of Wisconsin payroll

---

**2.** At trial, Croft claimed that on October 29, 1981, he submitted the results of sixty-six asbestos tests to the Weston town board.

**3.** At trial, the Government asked Croft whether he, in fact, submitted Johnson's calculations to the Weston town board. Croft replied, "I do not know how it got there."

records, Caplenas received $14,176.85 during 1981 and a substantial portion of that sum was drawn from the special EPA account.

Once the EPA officials became aware of Croft's private asbestos project for the town of Weston, they commenced an investigation into whether or not EPA funds were disbursed in payment for research on that project. The evidence obtained during that investigation was presented to a Federal Grand Jury, and on March 2, 1983, the Grand Jury returned a three-count indictment against Croft for knowingly converting, to his own use, the services performed by James Williams, Laurel Johnson, and Nijole Caplenas on the Weston research project and paid for with EPA funds, in violation of 18 U.S.C. § 641. Croft pled not guilty to all three counts of the indictment. Some two months later, on April 27, 1983, the Grand Jury filed a superseding three-count indictment alleging that Croft knowingly *and unlawfully* converted the services of Williams, Johnson, and Caplenas to his own use in violation of 18 U.S.C. § 641. On August 8, 1983, the Government filed a bill of particulars to clarify the indictment and notify Croft that the relevant time frame included the period during which Williams, Johnson, and Caplenas "worked under the direction of the defendant [Croft], and during which time the defendant converted [their] services...." The case proceeded to trial and Croft claimed, as a defense, that the water chemistries and asbestos counts performed by the three research assistants on the Weston water samples were simply training procedures that allowed the students to refine the techniques required for the successful completion of the EPA project. Croft claimed that none of the research assistants' calculations nor work products were forwarded to the Weston town board. However, upon cross-examination, Croft was unable to explain the presence of Johnson's calculations in the data submitted to the town board.

Based upon the evidence presented at trial, the jury found Croft guilty on one of the three counts of the indictment; converting, to his own use, the services performed by Laurel Johnson and paid for with EPA funds. On November 25, 1983, Croft was sentenced to one year imprisonment, fined $5,000, and ordered to pay restitution in the amount of $2,955.13 to the United States Government. On appeal, Croft initially contends that the services of Laurel Johnson are not a "thing of value" as that phrase is used in 18 U.S.C. § 641. In the alternative, Croft claims that the indictment was insufficient because it failed to allege the element of specific intent that is required for prosecution under 18 U.S.C. § 641. Finally, Croft contends that the district court erred in admitting evidence of the payroll account records, in failing to properly instruct the jury on Croft's defense and the elements of a section 641 offense, and in failing to provide the jury with the transcripts of requested testimony.

## II

### A. "THING OF VALUE" UNDER 18 U.S.C. § 641

■ Croft initially contends that his actions do not fall within the purview of 18 U.S.C. § 641, which provides in pertinent part:

"Whoever ... knowingly converts to his own use ... any ... thing of value of the United States ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

According to Croft, the services of Laurel Johnson do not constitute a "thing of value" as that phrase is used in 18 U.S.C. § 641. To support this position, Croft relies upon the reasoning of the Ninth Circuit in *Chappell v. United States*, 270 F.2d 274 (9th Cir.1959) ("*Chappell*"), where a sergeant in the United States Air Force was prosecuted under section 641 for ordering an airman to paint apartments, owned by the sergeant, during the airman's normal

duty hours. The court in *Chappell* stated that the purpose of 18 U.S.C. § 641 was to place crimes such as "stealing, larceny, and its variants and equivalents" into one category and "[s]uch offenses were never thought to be committed by one man making use of the services of another's servant without reimbursing the master." *Id.* at 276. The court thus held that "[i]t is plain that there is no warrant in the language of [18 U.S.C. § 641] to sustain the Government's attempt to treat the services and labor of [the airman] as a thing of value." *Id.* at 276.

Our analysis of Croft's claim under 18 U.S.C. § 641 begins with the Supreme Court's seminal decision in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (*"Morissette"*). In that case, a civilian deer hunter was prosecuted under section 641 for knowingly converting, to his own use, discarded simulated bombs he found while hunting on United States Air Force property. The issue before the Supreme Court was whether the Government was required to prove the defendant's intent to convert such property to his own use. According to the Court, Congress' purpose in enacting 18 U.S.C. § 641 was "to collect from scattered sources crimes so kindred as to belong in one category. Not one of these [crimes] had been interpreted to be a crime without intention and no purpose to differentiate between them in the matter of intent is disclosed." *Id.* at 266–67, 72 S.Ct. at 251–52. Thus, the Court concluded that Congress did not seek "to eliminate intent from any offense," enumerated in section 641, including knowing conversion. *Id.* at 273, 72 S.Ct. at 255. Following a thorough review of the legislative history of 18 U.S.C. § 641, the Court added that, "[t]he history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law *and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions."* *Id.* at 269 n. 28, 72 S.Ct. at 253 n. 28 (emphasis added). In line with the Supreme Court's reasoning in *Morissette*, this court has determined that

"the purpose of § 641 ... is to provide a sanction for intentional conduct by which a person *either misappropriates or obtains a wrongful advantage from government property."* *United States v. Bailey*, 734 F.2d 296, 304 (7th Cir.1984) (emphasis added) (citing *Morissette*, 342 U.S. at 271, 72 S.Ct. at 254) (*"Bailey"*).

The broad scope of 18 U.S.C. § 641 as analyzed by the Supreme Court in *Morissette* and this court in *Bailey* has been interpreted by the Federal circuits to include the knowing conversion of intangible "things of value." For example, in *United States v. May*, 625 F.2d 186 (8th Cir.1980) (*"May"*), a former Adjutant General of the National Guard used National Guard aircrafts, fuel, and personnel for "his own convenience rather than that of the National Guard." *Id.* at 188–89. The general was convicted for knowing conversion of United States property in violation of 18 U.S.C. § 641, and argued on appeal that under *Chappell* "any evidence as to the value of intangibles, specifically the salaries of servicemen, was impermissible." *May*, 625 F.2d at 191. The Eighth Circuit rejected this argument, holding that *"'valuables' not ordinarily subject to tort conversion may nevertheless be subject to criminal conversion under section 641."* *Id.* (emphasis added). The court reasoned that "the statutory words 'thing of value,' broaden the scope of section 641 beyond the subject matter of the common law torts which are its foundation." *Id.* Thus, the court adhered to the language in *Morissette* that section 641 applies to acts of "larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *Id.* (quoting *Morissette*, 342 U.S. at 269 n. 28, 72 S.Ct. at 253 n. 28).

In *United States v. Girard*, 601 F.2d 69 (2d Cir.1979), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1980) (*"Girard"*), a DEA undercover agent retrieved information from a DEA computer file and sold it to members of a narcotics ring. The agent was convicted for knowing conver-

sion of United States property in violation of 18 U.S.C. § 641, and argued on appeal that the statute only applied to tangible property; not intangible information from a computer disk. The Second Circuit reviewed the legislative history of section 641 and stated that "we are impressed by Congress' repeated use of the phrase 'thing of value' in section 641 and its predecessors.... The word 'thing' notwithstanding, the phrase is generally construed to cover intangibles as well as tangibles." *Id.* at 71. The court thus concluded that "[a]lthough the content of a writing is an intangible, it is nonetheless a thing of value.... [T]he Government has a property interest in certain of its private records which it may protect by statute as a thing of value. It has done this by the enactment of section 641." *Id.*

Similarly, in *United States v. DiGilio,* 538 F.2d 972 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977) (*"DiGilio"*), the defendant was convicted of procuring unauthorized copies of FBI file documents in violation of 18 U.S.C. § 641. On appeal, the defendant argued that the unauthorized copies of records were not themselves "records," and thus he could not be convicted under section 641 for converting, to his own use, records of the United States. The Government responded that "the misappropriation of information falls within § 641's sanction." *Id.* at 977. The Third Circuit held that because the defendant's actions constituted an actual larceny of the records, there was no need to reach the issue of whether a conversion of the information contained on those records had, in fact, occurred. The court added, however, that:

"We do not, by resting upon the narrower ground that a technical larceny has been proved, intend to imply a rejection of the government's broader interpreta-

tion of § 641 .... *Much can be said in favor of the government's argument that Chappell v. United States, supra, is inconsistent with the interpretation of 641 by the Supreme Court in Morissette ...."*

*Id.* at 978 (emphasis added). The Third Circuit relied upon the same language quoted by the Eighth Circuit in *May,* that 18 U.S.C. § 641 applies to acts of "larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *DiGilio,* 538 F.2d at 978 (quoting *Morissette,* 342 U.S. at 269 n. 28, 72 S.Ct. at 253 n. 28). *See also United States v. Truong Dinh Hung,* 629 F.2d 908, 924 (4th Cir.1980).

In the present case, Croft improperly converted to his own use a "thing of value," specifically the services of Laurel Johnson. The record clearly reveals that Johnson, under Croft's supervision and direction, performed water chemistries on the Weston water samples, analyzed the asbestos count of those samples, compiled detailed calculations, and recorded the data that was later transmitted to the Weston town board. According to the testimony of Weston's attorney, the town board paid Croft "between $40,000 and $50,000" to conduct the Weston research project. At trial, Croft did not attempt to establish that he paid Laurel Johnson for her services with the funds received from the Weston town board. Rather, the uncontradicted testimony and evidence reveal that the services performed by Johnson in testing the Weston water samples and recording the results in a laboratory log book were paid in full by the EPA.[4] As a result of the EPA's payment for the services performed by Johnson on the Weston research project, the EPA has a financial interest in those

---

**4.** The record reveals that Laurel Johnson's services were paid for out of the special EPA account established by the University of Wisconsin. According to the conditions set forth in the EPA agreement and the regulations enumerated in 40 C.F.R. § 30.100 *et seq.,* the EPA, an executive agency of the United States Government, maintains substantial supervision and control

over the funds in that account. Thus, for purposes of our analysis, the EPA paid for Johnson's services. *See United States v. Mitchell,* 625 F.2d 158, 160–61 (7th Cir.1980), *cert. denied,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1981); *United States v. Maxwell,* 588 F.2d 568, 570–74 (7th Cir.1978), *cert. denied,* 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979).

services that it is entitled to protect as a "thing of value" under 18 U.S.C. § 641.

According to this court's analysis in *Bailey*, "the purpose of § 641 ... is to provide a sanction for intentional conduct by which a person either misappropriates or obtains a wrongful advantage from government property." 734 F.2d at 304. It is evident that Croft obtained a wrongful advantage by converting and misappropriating the services of Laurel Johnson for his personal research project while allowing those services to be paid for by the EPA. Croft's conversion of Johnson's services for his own use, just as the conversion of intangible services in *May* and the conversion of intangible information in *Girard*, is one of those acts referred to by the Supreme Court that shades into the crimes of larceny or embezzlement "but which, most strictly considered, might not be found to fit their fixed definitions." *Morissette*, 342 U.S. at 269 n. 28, 72 S.Ct. at 253 n. 28. We disagree with the Ninth Circuit's limited, narrow, and unrealistic interpretation in *Chappell* that intangible services do not constitute a "thing of value" as that phrase is used in section 641. Rather, we adopt the logical construction of section 641 mandated by the Supreme Court in *Morissette* and this court in *Bailey*, and hold that the services rendered by Laurel Johnson on the Weston research project do constitute a "thing of value" under 18 U.S.C. § 641.[5] *Accord Burnette v. United States*, 222 F.2d 426, 427 (6th Cir.1955) (per curiam) (United States Army officer convicted under 18 U.S.C. § 641 for "convert[ing] to his own use the services and labor of two employees of the United States"). Indeed, as Justice Holmes has so aptly reasoned, "[w]e agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929).

### B. "KNOWING CONVERSION" UNDER 18 U.S.C. § 641

Croft next claims that even if his actions fall within the purview of 18 U.S.C. § 641, the indictment was insufficient because it only charged Croft with "knowingly and unlawfully" converting the services of Laurel Johnson to his own use. As we have previously noted, the Supreme Court in *Morissette* interpreted the language of 18 U.S.C. § 641 to include an element of intent. Croft contends that the phrase "knowingly and unlawfully" does not sufficiently and clearly set forth this element of intent as it has been construed for purposes of section 641. Thus, Croft reasons that the insufficient indictment renders the conviction based thereon fatally defective. *See, e.g., United States v. Denmon*, 483 F.2d 1093, 1095 (8th Cir.1973).

In *United States v. Watkins*, 709 F.2d 475 (7th Cir.1983) ("*Watkins*"), this court acknowledged that an indictment under 18 U.S.C. § 641 is "sufficient if it, first, alleges the elements of the offense charged and fairly informs a defendant of the charge against him or her, and, second, enables the defendant to plead an acquittal or conviction in bar of future prosecutions." 709 F.2d at 478 (citing *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1973)). According to the Eighth Circuit in *May*, "specific intent is a necessary element that must be alleged in the indictment" under section 641, but no "particular verbal formula" is required. 625 F.2d at 190. *See also Watkins*, 709 F.2d at 478 ("no particular words or phrases must be used" in an indictment under section 641). The relevant case law demonstrates that no particular verbal formula or talismanic combination of words is required to properly allege the element of specific intent in an indictment under 18 U.S.C. § 641. In *Morissette*, the Supreme Court approved a section 641 indictment charg-

---

**5.** The concurring opinion appears to misconstrue our holding with its emphatic statement that "services are not property, at least since the 13th Amendment abolished slavery." As we state in the text of the opinion, our narrow holding is that "the services rendered by Laurel Johnson on the Weston research project do constitute a 'thing of value' under 18 U.S.C. § 641."

ing, *inter alia*, that the defendant "did unlawfully, wilfully and knowingly ... convert to his own use." 342 U.S. at 270, 72 S.Ct. at 253. On the other hand, a number of Federal circuit courts have held that the phrase "wilfully and knowingly" is sufficient to allege the specific intent element of section 641 and apprise the defendant of the crime charged. *See United States v. Baker*, 693 F.2d 183, 186 (D.C.Cir.1982); *May*, 625 F.2d at 189; *O'Malley v. United States*, 378 F.2d 401, 404 (1st Cir.1967), *cert. denied*, 389 U.S. 1008, 88 S.Ct. 571, 19 L.Ed.2d 606 (1968). Neither our research nor the parties' briefs reveal any Federal circuit law construing the phrase "knowingly and unlawfully" as used in the section 641 indictment presently before this court for review.

Our examination of the sufficiency of the indictment in this case is guided by the Supreme Court's analysis in *Morissette* that "knowing conversion requires more than knowledge that defendant was taking the property into his possession. He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion." 342 U.S. at 270–71, 72 S.Ct. at 253–54. According to the Court, the section 641 indictment must charge the defendant with "criminal intent to ... knowingly convert, that is, *wrongfully* to deprive another of possession of property." *Id.* at 276, 72 S.Ct. at 256 (emphasis original). *See also United States v. Wilson*, 636 F.2d 225, 226 (8th Cir.1980). In the original indictment of March 2, 1983, the Grand Jury charged Croft with knowingly converting, to his own use, the services performed by Williams, Johnson, and Caplenas and paid for by the EPA. In the superseding indictment of April 27, 1983, the Grand Jury charged Croft with *knowingly and unlawfully* converting those same services. The phrase "knowingly and unlawfully" charges Croft with more than knowingly taking the services of Williams, Johnson, and Caplenas; it charges him with knowingly taking those services *in violation of the law*. In sum, the phrase "knowingly and unlawfully" properly charges Croft with *wrongfully* depriving

the EPA of its services. Thus, we hold that the indictment in this case sufficiently alleges the specific intent element of 18 U.S.C. § 641, as defined by the court in *Morissette*, and accurately informs Croft of the crime charged.

Croft further contends that the indictment is insufficient because it failed to inform him of the "services" that were converted. A review of the record reveals that this claim is likewise without merit. The Government, in response to Croft's pre-trial motion to dismiss the indictment, filed a bill of particulars clarifying and particularizing that the relevant time frame of the indictment was the period that Williams, Johnson, and Caplenas "worked under the direction of the defendant [Croft], and during which time the defendant converted [their] services." The Government further explained that the services consisted of Johnson's "laboratory work on the defendant's personal project with the Town of Weston" and the "research and laboratory time" spent by Williams and Caplenas "on the defendant's personal project with the Town of Weston." The detailed information provided within the Government's bill of particulars clearly informed Croft of the type of services converted to his own use, and thus we hold that the indictment, as amended, was more than sufficient to charge Croft with a violation of 18 U.S.C. § 641. *Accord Watkins*, 709 F.2d at 478.

## C. ALLEGED TRIAL ERRORS

Croft next contends that the district court erred in admitting computer printouts, containing the University of Wisconsin's payroll records, into evidence and in denying Croft access to the computer program. At trial, the Government elicited testimony from Richard Laufenburg, Director of Payroll and Benefits Services at the University of Wisconsin-Madison, that the computer printouts in question were "individual income tax detail summary for the ... calendar year 1981 which reflects the individual payment made to all individuals through the payroll system." According to Laufenburg, these computer-gener-

ated compilations of the 1981 payroll records were kept in the regular course of business of the University of Wisconsin-Madison payroll office. The computer printouts were made contemporaneously with or near the time that the payments were made and the payroll data became available. Laufenburg added that the printouts accurately reflected the payroll data and were maintained under his direction and supervision. Moreover, Laufenburg testified that his staff reviewed and audited the payroll data contained on the computer printouts for accuracy, on a regular basis throughout the year. Based upon this adequate foundation evidence, the district court properly admitted the computer printouts as business records that satisfied the hearsay exception of Fed.R.Evid. 803(6).[6] Croft contends that the district court erred in admitting the computer printouts because the Government failed to prove that the information entered into the computer was accurate and reliable. According to Croft, this court's decision in *United States v. Weatherspoon*, 581 F.2d 595 (7th Cir.1978) (*"Weatherspoon"*), requires that the Government establish the accuracy of the input procedures before the computer printout can be introduced into evidence.

■ It is well-settled that computer data compilations may constitute business records for purposes of Fed.R.Evid. 803(6) and may be admitted at trial if a proper foundation is established. *United States v. Young Bros., Inc.*, 728 F.2d 682, 694 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984); *Rosenburg v. Collins*, 624 F.2d 659, 665 (5th Cir.1980); *United States v. Scholle*, 553 F.2d 1109, 1124–25 (8th Cir.1977), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300

(1978); *Annot.,* 7 A.L.R.4th 8, 15 (1981). According to this court in *United States v. Chappell*, 698 F.2d 308 (7th Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), business records are admissible "if they are kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the records, as shown by the testimony of the custodian or other qualified witness." 698 F.2d at 311. It is important to note, however, that the business records are inadmissible "if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* For purposes of review, we are guided by the clearly established rule of law that the "trial court has broad discretion in ascertaining the admissibility of business records, and its ruling should be disturbed only when that discretion is abused." *United States v. Young Bros., Inc.*, 728 F.2d at 694 (quoting *Rosenberg v. Collins*, 624 F.2d at 665); *United States v. Vela*, 673 F.2d 86, 90 (5th Cir.1982).

■ In the present case, the evidence establishes that the computer printouts in question were maintained and supervised by the Director of the Payroll and Benefits Services at the University of Wisconsin-Madison—one Richard Laufenburg. According to Laufenburg, the printouts were made contemporaneously with or near the time that the payroll data became available, the printouts were kept in the regular course of business, and it was the regular practice of the University of Wisconsin-Madison to make such printouts. Moreover, with regard to the reliability and trustworthiness of the payroll data information entered into the computer and com-

---

**6.** Fed.R.Evid. 803(6) provides, in pertinent part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."

piled in the printouts, Laufenburg testified that members of his staff performed "various reviews and audits ... throughout the year." Laufenburg further asserted that if errors occur in the input of payroll information, these reviews "should pick it up." Finally, Laufenburg stressed the importance of the precautions taken by his staff to ensure the accuracy of these printouts, which are relied upon by the University of Wisconsin to complete the more than 60,-000 W-2 employee payroll forms annually processed by the institution for the Internal Revenue Service.

The record reveals that defense counsel thoroughly cross-examined Laufenberg concerning the accuracy of the computer and the input procedures. According to the uncontroverted evidence, the computer printouts were reviewed and audited for accuracy on a regular basis throughout the year and also relied upon by the University of Wisconsin-Madison to complete tax forms for the Internal Revenue *Service. This evidence, when combined with the fact that the audits performed by Laufenburg's staff should have "picked up" any errors in the input of payroll information, sufficiently establishes the reliability and trustworthiness of the computer printouts. Thus, in view of the totality of the circumstances we hold that the district court did not abuse its discretion in admitting the printouts into evidence under the hearsay exception of Fed.R.Evid. 803(6).[7] We further note that the printouts in the present case were simply computer compilations of payroll data information for 1981. The printouts contained no calculations or studies that relied upon a complex and intricate computer program. Instead, the relevant payroll evidence was simply transferred from payroll data sheets to a computer disk for convenient storage in the computer and easy retrieval on computer printouts. In light of the fact that the actual computer program was of little if any importance in the present case, we hold that no error was committed when the district court failed to allow Croft access to the program.

Croft next claims that the jury instructions concerning his theory of defense were incomplete and thus improper. The district court instructed the jury:

"It is the defendant's theory of this case that he intended that the work performed upon the Weston water samples by James Williams, Laurel Johnson and Nijole Caplenas was for the purpose of instructing them in the technique of filtering water samples, preparing them for fiber analysis and counting asbestos fibers. The defendant's additional theory of this case is that the Environmental Protection Agency did not lose the services of James Williams, Laurel Johnson and Nijole Caplenas.

Now, the defendant has no burden to prove these theories. The government has the burden of proving guilt of the defendant beyond a reasonable doubt...."

Croft contends that the district court should have further informed the jury of the consequences of an acquittal, that Croft believed training was permitted under the EPA grant, and that Croft believed he did not submit the calculations and work

---

**7.** In *Weatherspoon,* this court held that computer printouts were properly admitted into evidence following the Government's proof of "what the input procedures were, ... that the input procedures and printouts were accurate within two percent, ... that the computer was tested for internal programming errors on a monthly basis, and ... that the printouts were made, maintained and relied on ... in the ordinary course of ... business activities." 581 F.2d at 598. Although the evidence of computer input procedures in the present case is not as thorough and all-encompassing as that in *Weatherspoon;* the evidence, nonetheless, "lays a foundation sufficient to warrant a finding that such information is trustworthy and the opposing party is given [an] ... opportunity to inquire into the accuracy of the computer and its input procedures ...." *United States v. Liebert,* 519 F.2d 542, 547 (3d Cir.), *cert. denied,* 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 301 (1975) (citing *United States v. De Georgia,* 420 F.2d 889, 893 n. 11 (9th Cir.1969)). *See also United States v. Fendley,* 522 F.2d 181, 187 (5th Cir.1975); *United States v. Russo,* 480 F.2d 1228, 1241 (6th Cir.1973), *cert. denied,* 414 U.S. 1157, 94 S.Ct. 915, 39 L.Ed.2d 109 (1974).

product of his research assistants to the Weston town board.

■ The law is well-settled in this circuit that "[a] defendant is entitled to have the jury instructed on his theory of the defense if the defense is supported by the law and the evidence." *United States v. Martin-Trigona,* 684 F.2d 485, 493 (7th Cir. 1982) (citing *United States v. Grimes,* 413 F.2d 1376, 1378 (7th Cir.1969)). *See also United States v. Moore,* 627 F.2d 830, 832–33 (7th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). In the instant case, Croft admits that he directed Williams, Johnson, and Caplenas to analyze the Weston water samples. Croft simply claims as a defense that he acted in good faith, believing that his actions were proper and did not constitute a violation of the law. In short, Croft's defense consists of his belief that he lacked the specific intent required to be convicted of converting, to his own use, "a thing of value" of the EPA, in violation of 18 U.S.C. § 641. According to the rule of law in this circuit, "[i]n determining the propriety of instructions they are to be viewed as a whole, and as long as the instructions treat the issues fairly and accurately they will not be interfered with on appeal." *United States v. Ray,* 683 F.2d 1116, 1127 (7th Cir.), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982) (citing *United States v. Patrick,* 542 F.2d 381, 389 (7th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977)). The district court's theory of defense instruction clearly and fairly informed the jury of Croft's belief that he acted in good faith when he directed his EPA research assistants to analyze the Weston water samples. Thus, upon review of the jury instructions as a whole, including the Government's burden of proving the specific intent element of section 641 and Croft's belief that he did not violate the law, we hold that the theory of defense instruction, as recited by the district court, was proper.

■ Croft next contends that the district court erred in instructing the jury on the issue of the EPA's ownership of the servic-

es performed by Williams, Johnson, and Caplenas. Croft erroneously asserts that the district court failed to allow the jury to determine the ownership issue as a question of fact. The district court instructed the jury that for purposes of 18 U.S.C. § 641, the Government was required to prove, beyond a reasonable doubt:

"1. That the defendant converted a thing of value worth in excess of $100, an employee's services, to his own use;

2. That the services involved belonged to the United States Government by virtue of the employee having been paid with federal money.

3. That the conversion was done knowingly and unlawfully."

The court added that on the issue of "services belonging to the Federal Government, ... when the University of Wisconsin draws funds to pay an employee in a manner that debits a Federal grant for the amount of funds drawn, the University is acting as an agent of the United States and the funds so drawn are funds of the United States." This latter instruction properly informed the jury that, as a matter of law, the funds drawn from the special EPA account belonged to the EPA, an executive agency of the United States Government. According to the detailed regulations of 40 C.F.R. § 30.100 *et seq.,* the EPA exercises substantial supervision and control over grant funds, such as those held by the University of Wisconsin-Madison, and thus the funds do, as a matter of law, belong to the EPA. *See United States v. Mitchell,* 625 F.2d 158, 160–61 (7th Cir.1980), *cert. denied,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1981); *United States v. Maxwell,* 588 F.2d 568, 571–74 (7th Cir.1978), *cert. denied,* 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979). The jury, guided by this legal principle, was properly required to decide the factual issue of whether the services of Williams, Johnson, and Caplenas belonged to the EPA. Thus, we hold that the district court did not err in instructing the jury as to the Government's ownership of the EPA funds.

Croft finally claims that the district court erred in failing to grant the jury's request to "hear the complete testimony of Laurel Johnson; and the testimony of Mr. Croft regarding Laurel Johnson's employment." The record reveals that the jury requested the testimony at 12:52 a.m., some five hours after it began deliberations. The court informed the jury that the testimony was not available at that time and that arrangements would be made to sequester the jury. The parties and the court agreed to contact the free-lance court reporters who attended the trial, and order them to transcribe the testimony as soon as possible. The court reconvened some ten hours later, at 10:45 a.m., and at that time the trial judge informed the parties that the free-lance reporters who were to transcribe the forty-five minutes of Johnson's testimony and the three hours of Croft's testimony were unavailable. In light of this dilemma, the trial judge reasoned that:

> "I think to sequester a jury for several days in this matter is inappropriate. I also believe that because of the publicity that there may very well be, that we certainly wouldn't want them or I think it would not be wise to have them outside of sequestration for five or six or three or four or how many days it might take to round up the transcripts ...."

Accordingly the trial judge informed the jury that the free-lance reporters were unavailable and "that it would not be in order nor appropriate to await the preparation of these transcripts." The judge added that, "[a]s jurors, you are requested to render your verdict based upon your recollection of all the testimony which has been given and all the exhibits which have been provided."

The law is well-established in this circuit that "it is within the discretion of the trial court whether to read portions of the trial transcript back to the jury at its request." *United States v. Kuta,* 518 F.2d 947, 954 (7th Cir.1975), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385

(1976). *See also United States v. McCoy,* 517 F.2d 41, 44 (7th Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 195, 46 L.Ed.2d 127 (1975). In the instant case, the trial court judge solicited suggestions from the parties and properly weighed the interest of maintaining a sequestered jury to reach a verdict against the interest of providing the jury with transcripts of the requested testimony. Based upon the factors involved, including the inability to contact the free-lance court reporters, the logistical problems of sequestering the jury for an extended period of time, and the very real likelihood of exposing the jurors to adverse publicity if the order of sequestration were lifted, we hold that the district court's decision does not rise to an abuse of discretion.[8]

### III

We affirm the conviction of William Croft for knowingly and unlawfully converting, to his own use, a "thing of value" of the EPA, in violation of 18 U.S.C. § 641.

DUMBAULD, Senior District Judge, concurring.

I concur solely on the basis of *stare decisis.* In my judgment 18 U.S.C. § 641 has been interpreted in this Circuit as covering "intentional conduct by which a person either misappropriates or obtains a wrongful advantage from government property." *U.S. v. Bailey,* 734 F.2d 296, 304 (7th Cir.1984). If the quoted words were in the statute I should have no trouble at all. But as *res integra* I strongly doubt that they have the same meaning as the words used by Congress in 18 U.S.C. § 641: "Whoever embezzles, steals, purloins, or *knowingly converts* to his use ... *any* record, voucher, money or *thing of value* of the United States" is guilty of a crime. (Italics supplied). On the interpretation of this provision generally see *Morissette v. U.S.,* 342 U.S. 246, 272, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952). So substantial an extension of the conduct condemned

---

8. The record reveals that this trial was of public importance and had been the subject of a front-

page, headline article in the *Capitol Times,* a local Madison, Wisconsin newspaper.

as criminal ought ordinarily to be made only by the Congress, rather than by judicial construction.

The indictment charges defendant with wrongful and unlawful conversion of services, to wit the labor performed for defendant's financial advantage (testing water samples) by persons paid by government funds to work on a different project (testing cattle tissues). Defendant thus obtained a wrongful advantage, indirectly, from government property, to wit the funds used to pay defendant's helpers. But I doubt whether conversion of services is a violation of § 641, because services are not property, at least since the 13th amendment abolished slavery.

As noted in *Contractor Utility Sales Co., Inc. v. Certain-Teed Corporation,* (7th Cir.) 748 F.2d 1151, the interpretation favorable to the Government in the case at bar

> would seem to be a novel form of the now discredited dogma of "liberty of contract" as a property right. Roscoe Pound, *Jurisprudence* (1959) I, 95–96, 425. As Justice Holmes remarked on this subject: "By calling a business 'property' you make it seem like land ... An established business no doubt may have pecuniary value and commonly is protected by law against various unjustified injuries. But you cannot give it definiteness of contour by calling it a thing. It is a course of conduct...." *Truax v. Corrigan,* 257 U.S. 312, 342, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921).

Similarly, conversion of services may constitute misconduct, wrongful activity, or breach of obligation, but not property. You cannot make it property "by calling it a thing."

The offense charged, therefore, is not covered by the proscriptions of § 641. Under that construction of the statute, defendant's conviction cannot stand, for it is elementary that a defendant cannot be convicted for an offense not charged in the indictment. *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).

However, this course of reasoning is foreclosed by the previously quoted language from *Bailey,* and I conform to the precedent previously established in this Circuit.